**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DIANE G. MELECH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.: 10-00573-KD-M** |
| | ) | |
| **LIFE INSURANCE COMPANY OF** | ) | |
| **NORTH AMERICA, PENSION AND** | ) | |
| **WELFARE PLAN ADMINISTRATION** | ) | |
| **COMMITTEE – THE HERTZ** | ) | |
| **CORPORATION, HERTZ CUSTOM** | ) | |
| **BENEFIT PROGRAM, AND THE HERTZ** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This action is before the Court on motion for summary judgment filed by defendants

Life Insurance Company of North America, Pension and Welfare Plan Administration

Committee – The Hertz Corporation, Hertz Custom Benefit Program, and The Hertz

Corporation (defendants), memorandum in support, proposed determinations of

undisputed facts and conclusions of law, and evidentiary submissions (docs. 109-112); the

response and evidentiary submissions filed by plaintiff Diane G. Melech (Melech) (docs.

143-145); and defendants' reply (doc. 150).   Upon consideration and for the reasons set

forth herein, the motion for summary judgment is GRANTED. [1] [2]

---

[1]   LINA's motion to strike (doc. 151) Melech's Exhibit 2 (Social Security claim file) and
Exhibit 3 (Melech's Declaration) (doc. 144) submitted in support of her response is
**GRANTED** to the extent that the Court will not consider any evidence in Melech's Social
Security claim file that was not before LINA.   In *Blankenship v. Metropolitan Life Ins.
Co*. 644 F.3d 1350, 1354 (11th Cir. 2011), the Court of Appeals for the Eleventh Circuit
explained that "[r]eview of the plan administrator's denial of benefits is limited to
consideration of the material available to the administrator at the time it made its

Melech filed her complaint for legal and equitable relief for violations of the Employee Retirement Income Security Act (ERISA), pursuant to 29 U.S.C. § 1132(a)(1). Initially, Melech brought Count One for failure to provide plan documents (doc. 1, p. 6). However, Melech withdrew that claim for relief in her response to the motion for summary judgment (doc. 145, p. 4).  Melech's remaining Count 2 alleges a claim for long term disability benefits pursuant to 29 U.S.C.  1132(a)(1(B).  Melech alleges that she is disabled under the terms of the Hertz Custom Benefit Program (the Plan), an employee welfare benefit plan or an employee pension plan as defined in 29 U.S.C. §§ 1001, *et seq.*

I. Findings of Fact

A.  The Policy

LINA issued Group Policy VDT-960024 to The Hertz Corporation.  The Hertz Corporation is the Plan Sponsor and the Plan Administrator for the Plan.  LINA serves as

---

decision[.]" (citations omitted); *see also Ray v. Sun Life & Health Ins. Co.*, 443 Fed. Appx. 529, 533 (11th Cir. 2011) ("Based on the administrative record available to Sun Life when it made its decision, . . . we can not say that Sun Life's denial of benefits was *de novo* wrong.") (citing *Blankenship,* 644 F.3d at 1354  for the premise that "review of benefits denial is limited to consideration of the material available to the administrator at the time it made its decision").

[2]  Melech moves the Court to strike defendants' argument at pages seven to thirteen of the reply on the basis that it is a new ground for summary judgment which cannot properly be raised in the reply. (Doc. 153, motion; Doc. 158, defendants' response).  Defendants respond that their arguments are not new arguments or theories for relief but instead were raised to address Melech's arguments in her response.  The motion to strike is **DENIED.**  In Count II of her complaint, captioned "Action for Benefits under 29 U.S.C. § 1132(a)(1)(B)", Melech made statements that defendants had not complied with "29 U.S.C. § 1133's requirement" regarding the wording of the denial letter and that she did not receive a "full and fair review of the decision denying the claim as is required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1." (Doc. 1, ¶ 48-50, 52).  However, Melech's "Statement of Facts" does not contain any factual allegation to form the basis of a claim of violation of procedural requirements such as would put defendants on notice of the specific violations that were asserted.  Therefore, defendants properly moved for summary judgment as to Melech's "Action for Benefits" asserting that Melech received a full and fair review of her claim initially and on appeal and properly replied to Melech's response wherein she identified for the first time the underlying factual basis for her claim.

the claims administrator with responsibility for adjudicating claims for long term disability benefits made by participants of the Plan (doc. 112-1, p. 2-3, Affidavit of Kellie Downey, Senior Operations Representative at LINA); (doc. 112-2, Administrative Record).

Under the Policy, the claimant Melech must provide proof of disability in order for benefits to be paid. The policy states as follows:

> The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all other terms and conditions of the policy. He or she must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before benefits will be paid. The Disability Benefit is shown in the Schedule of Benefits.

(Doc. 112-2, p. 125, Copy of Policy).

The Policy defines "Total Disability" as follows:

Definition of Disability/Disabled

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

1. unable to perform the material duties of his or her Regular Occupation; and

2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

(Doc. 112-2, p. 110, 118).

The Policy also provides that "[a]fter Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:

1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and

2. unable to earn 60% or more of his or her Indexed Earnings.

The Insurance Company will require proof of earnings and continued Disability."

(Doc. 112-2, p. 110, 118).

The Policy defines "Regular Occupation" as "[t]he occupation the employee routinely performs at the time the Disability begins.  In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location." (Doc. 112-2, p. 136).

The terms and conditions of the Policy, provide that benefits become payable as detailed below:

> The Insurance Company will pay Disability Benefits if an employee becomes Disabled while covered under this Policy. The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy. He or she must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before benefits will be paid....

> The Insurance Company will require continued proof of the Employee's Disability for benefits for continue.

(Doc. 112-2, p. 125).

<u>B. The Claim</u>

Melech began working for Hertz Corporation on June 3, 1977 and worked full time as a Location Manager.  Melech was responsible for managing the service lot and its rental counter.  (Doc. 145, p. 5).  Her duties required that she be able to sit for four hours, walk for eight hours, stand for eight hours, lift for two hours, bend or twist for thee hours and drive for eight hours. (Doc. 112-2, p. 354).  Melech's last day of employment was May 8, 2007. (Doc. 112-2, p. 366).  Melech left work with complaints of neck, shoulder and back pain, headaches, and numbness in her right arm and hand. (Doc. 112-2, p. 184).

Melech was treated by Dr. Edmund C. Dyas, IV, an orthopedic physician on May 10, 2007, for chronic neck and right shoulder pain.[3]  Dr. Dyas noted as follows:

> Patient is having more and more neck and shoulder pain on the right. She's got bad degenerative disc disease at 5-6, 6-7 with stenosis.  She's also got frank tendinitis in the right shoulder.  She works with a computer 50 hours a week, and I think that's entirely too much for her.  We'll take her off work 2 weeks, put her on PT [physical therapy] and we injected the subscapular bursa today and renewed her Lortab 5.  We'll see her back in 2 weeks.

(Doc. 112-2, p. 339).

From May 14, 2007 through June 20, 2007, Melech went to physical therapy at Fleming Rehab and Sports Medicine two to three times per week.  (Doc. 112-2, p. 249-267).  The physical therapists' assessment notes are generally unreadable either because of poor handwriting or use of symbols and acronyms. However, an overall review indicates that Melech initially had tenderness in the cervical spine, reduced strength ("3" out of  "5") and limited range of motion in her neck and right shoulder.  The therapist's goal was to increase the range of motion and strength and improve Melech's posture which was initially noted as "head forward", "shoulders rounded" and "c spine flexed". (Doc. 112-2, p. 266-267).  The notes indicate that Melech attended therapy in May and June 2007, and was to continue treatment for two to three more weeks, but did not, (Doc 112-2, p. 249-250).  One readable assessment was written on June 13, 2007, Melech's next to last session  – "Pt. tol therap well. No complaints of pain or discomfort." (Doc. 112-2, p. 251).  Another readable assessment was written on June 11, 2007 –

---

[3] In Melech's proposed statement of facts, she states that she first saw Dr. Dyas on April 1, 2004 with complaints of neck pain radiating down her shoulder into her arm.  She provides an insufficient cite to the record for this statement of fact.  Melech cites to "Plaintiff's Evidentiary Submission "Pl's Evid. Sub.") D.E. 144 at Exh. 2).  Docket entry 144, Exhibit 2 is Melech's Social Security Claim file which consist of 148 pages.  The Court has stricken Exhibit 2 to the extent that any evidence therein was not before LINA on the administration of Melech's claim. Additionally, without a cite to a specific page among the 148 pages, the Court will not search Docket Entry 144 to find Melech's evidence.

"Overall cervical mobility and [head ache] pain are improving.  Though still stiff esp[ecially] upper C & T spine.  Needs to cont[inue] to advance postural program to help [decrease] strain __?__ C spine." (Doc. 112-2, p. 252).

On May 18, 2007, Melech was referred to Dr. Todd Engerson, an orthopedic physician, for a second opinion. Dr. Engerson noted as follows:

> [Physical Examination]  Healthy appearing lady.  She has some cervical spasm, some tenderness diffusely in the interscapular region, upper trapezius on the right side.  Full [range of motion] of her right shoulder with mild impingement signs.  Does have some pain with resisted abduction and forward elevation.  Gross motor and sensory testing upper extremities basically [within normal limits].

> X-Ray C-spine show significant cervical [degenerative disc disease] at 5-6 and 6-7 with some good sized posterior osteophytes, loss of the normal cervical lordosis associated with spasm.

> [Impression]: Cervical [degenerative disc disease] with exacerbation.

> [Recommendation]: I agree with Dr. Dyas' treatment and have written a note back to that effect.  See Dr. Dyas in follow-up

(Doc. 112-2, p. 237).

Dr. Dyas saw Melech again on May 24, 2007, he noted as follows:

> A little better with her physical therapy and rest.  We will keep her off until next Tuesday and see her back here in two weeks.

(Doc. 112-2, p. 339).

On June 7, 2007, Dr. Dyas noted as follows:

> Patient is having more pain in her neck, shoulder and arm.  She is intact neurologically.  She is depressed about her job situation and I think that we need to get a MRI scan of her neck to see if it is any worse as it has been over a year.  I also think that she can not go back to this job.

(Doc. 112-2, p. 339).

Also, on June 7, 2007, Dr. Dyas wrote as follows:

To Whom it May Concern

The above captioned patient is under my care. She is permanently and totally
disabled.  She can not return to her present job.  . . .

(Doc. 112-2, p. 340).

On June 12, 2007, the MRI of Melech's cervical spine showed:

Clinical History: Neck and Right Upper Extremity Pain.

Findings:  Spin-echo sagittal, axial and STIR sagittal images were
obtained.  The cervical spine is in anatomic alignment.  There is mild
flattening of the C5-6 and C6-7 intervertebral disc without evidence of a
disc protrusion and there is also bilateral spondolytic change at these 2
levels with foraminal encroachment.  No other abnormality of the cord is
seen.  Bone marrow signal is within normal limits.

Impression:  Bilateral spondylosis C5-6 and C6-7 with foraminal
encroachment.

(Doc. 112-2, p. 339).

On September 13, 2007, Melech saw Dr. Dyas again and he noted as follows:

Continues to have disabling pain in her neck and shoulder.  I injected the
trigger area in her neck and renewed her medicine today.  We will see her
back here as needed.  She still can't work with all of these problems.

(Doc. 112-2, p. 311, 339)

On or about October 2, 2007, Melech applied for long term disability benefits with LINA

and her initial claims manager was Eric Poliziani. (Doc. 112-2, p. 4 "Primary Claim File.")

Melech's occupation was identified as "Station Manager" with an occupational category of

"Office and Clerical". (Doc. 112-2, p. 66).  Her medical condition was identified as "severe

degenerative disk disease". (*Id*.)  On or about October 4, 2007, a letter was mailed to Melech

which confirmed receipt of the claim, explained certain aspects of the claims process, and

requested additional information. (Doc. 112-2, p. 83-84).

On October 12, 2007, Melech saw Dr. Jonathan Miller with complaints of abdominal pain and diarrhea. (Doc. 112-2, p. 192).  Dr. Miller noted her history of "some degenerative disk disease, some hand pain, some anxiety and insomnia" and her current medications were "Prevacid, Xanax, Soma, occasional Lortab, fish oils and some vitamin E".  (*Id*.)  On physical examination (relevant to the issues before the Court), Dr. Miller noted that all "[j]oints show full range of motion" and that Melech's neck was "Supple.  No [jugular vein distension]. Nontender." (*Id*.)  Dr. Miller prescribed Ambien for insomnia instead of Xanax and Nexium for gastroesophageal reflux disease. (*Id*. p. 193).

On October 12, 2007, Poliziani, faxed a letter and form to Dr. Dyas asking that he provide office notes, answer questions regarding prognosis for recovery, return to work, and referral to other specialist, and also asking Dr. Dyas to "help [LINA] understand [Melech's] current level of functional ability by completing the enclosed Physical Abilities Assessment form." (Doc. 112-2, p. 342-345).

On October 18, 2007, Dr. Dyas faxed the form and letter back to Poliziani.  On the face of the letter Dr. Dyas appears to have written "Pt is permanently & totally disabled."  He did not complete the Physical Abilities Assessment form but did sign it. (Doc. 112-2, p. 341-345).

On October 24, 2007, Poliziani contacted Fleming Rehab.  Poliziani asked for rehabilitation notes from May 2007 to the present, prognosis, and any return to work plan. (Doc. 112-2, p. 322-323).  He also asked for "help [to] understand [Melech's] current level of functional ability by completing the enclosed Physical Abilities Assessment form." (*Id.*) Fleming Rehab responded by letter stating that  "we have not seen Ms. Melech since June 20, 2007 and cannot make any recommendations or assessments at this time" and that "we will need

to re-evaluate her or schedule a functional capacity evaluation (FCE) to determine her work ability." (Doc. 112-2, p. 321).   No FCE was obtained.

On November 6, 2007, Melech completed a "Disability Questionnaire & Activities of Daily Living" form. (Doc. 112-2, p. 184-187).  Melech stated that "her neck hurts very badly when sitting at computer causing severe headaches and neck pain, right arm and hand goes numb. Lower back hurts when standing or bending. For period of time using phone causes pain in neck." (doc. 112-2, p. 185).  She stated that she could drive "as needed" and regularly cooked, cleaned, shopped, did laundry, read, watched television, and attended church.  (*Id*.)  For recreation she stated that she "watched football, visit with family & friends, go out to eat, lay on beach during summer" (*Id*.)  She also reported that she attended to all her personal grooming and dressing needs.  (*Id*.)  As to exercise, she stated that her therapist had told her to "__ with elastic bands" (Doc. 112-2, p. 186).   Her medications were identified as Nexium once daily, Lortab as needed, Soma as needed, Xanax at night, and Estrace once daily. (Doc. 187).   She indicated her visits with Dr. Dyas were on an "as needed" basis. (Doc. 187).

Melech described the "Major Duties" of her job as "Doing reports, handling customers, renting cars, making schedules for employees, safety issues" . (Doc. 112-2, p. 186).  She described the "Minor Duties" of her job as "Moving cars, cleaning & vacuuming cars, preparing cars where necessary; inventory."  (*Id*).  She used a computer, copy machine, fax and a vacuum. (*Id*.)

On November 13, 2007, Poliziani "sent a follow up request" to Dr. Dyas.  Poliziani requested "objective findings, copies of June 2007 MRI, [patient] reports, medication, PAA

[physical abilities assessment] and office visit notes beyond [last office visit] in file of

9/13/07." (Doc. 112-2, p. 36).   Dr. Dyas did not respond to the request.

On November 20, 2007, Jeffrey Weber, Nurse Case Manager, reviewed Melech's

records and found that

> [Claimant] treating for neck pain due to [degenerative disc disease].
> Cervical MRI is unremarkable. Dr. Dyas states [claimant] is totally &
> permanently disabled due to pain.  [Record] does not support no work.

(Doc. 112-2, p. 183).

On November 26, 2007, Weber faxed a letter to Dr. Dyas requesting clarification as

to Melech's "condition and work status." (Doc. 112-2, p. 79-80).  The letter asked Dr. Dyas

to advise whether he had seen Melech since September 13, 2007, to "provide objective

findings to support Ms. Melech being permanently and totally disabled", and explained that

"an 'off work' note is not sufficient documentation to certify disability." (*Id.*).

On November 29, 2007, Poliziani wrote Melech that LINA was unable to approve her

claim. (Doc. 112-2, p. 172-176).   Poliziani explained that Melech's job of Location Manager

was categorized as Light Work in the U.S. Department of Labor Description of Occupational

Titles (DOT) and that LINA must look at Melech's occupation as defined in the DOT and not

her specific job.  He summarized the medical evidence including the June 12, 2007 MRI

results and other evidence including Melech's statement of daily activities that had been

reviewed. Poliziani explained as follows:

> Claim Summary
>
> Upon review of the documentation provided, we were unable to validate
> medical documentation which supported your inability to perform the
> material duties of your Regular Occupation.  In reviewing Dr. Engerson's
> office notes , no restrictions were noted and he concurred with Dr. Dyas
> treatment plan at that time of no work for 2 weeks.  A review of the MRI,
> while noting some flattening of the C5-6 and C6-7, noted your spine was

in anatomic alignment with no disc pertrusion and bone marrow signal being within normal limits. In reviewing Dr. Dyas' notes, while restrictions and limitations were noted, no findings supporting a no work restriction were documented.  Dr. Dyas notes contained no findings which support his notice that you are permanently disabled.

In an attempt to gather additional documentation from Dr. Dyas, our Nurse Case Manager contacted Dr. Dyas office on November 21, 2007 for clarification of his findings as they relate to your restrictions.  On November 26, 2007, we also contacted Dr. Dyas office and requested his objective findings to support his restrictions and limitations. To date, Dr. Dyas has not responded to either request.

As the medical documentation contained in your file does not support a no work restriction we are unable to approve your claim.

Therefore at this time we have closed your claim and no benefits are payable as the medical information does not support how you are unable to work.

(Doc. 112-2, p. 174-175).

Melech's was advised of her right to appeal in the denial letter.  The letter explained

that

Appeal Rights

If you disagree with our determination and intent to appeal this claim decision, you must submit a written appeal  . . .

You have the right to submit written comments as well as any new documentation you wish us to consider.  If you have additional information, it must also be sent for further review . . . .

We would be happy to consider any medical evidence which supports your total disability.  Medical evidence includes, but is not limited to: physician's office notes, hospital records, consultation reports, test result reports, therapy notes, physical and/or mental limitations (i.e., Functional Capacities Testing), etc.  These medical records should cover the period of May 2007 through the present.

(Doc. 112-2, p. 175).

Melech returned to Dr. Dyas' on January 3, 2008.  His notes state that

> Patient continues to have disabling pain in her neck and right shoulder.
> She has degenerative disc disease in her neck with cervical spondylosis.  I
> think she has a rotator cuff tear in the right shoulder.  We injected about
> the base of her neck today.  We renewed her medication Lortab and
> Soma.

(Doc. 112-2, p. 170).

On January 31, 2008, Melech appealed the decision. (Doc. 112-2, p. 168).   She

submitted office notes and a letter from Dr. Dyas dated January 3, 2008, wherein he

explained as follows:

> This 57 year old white female has been followed since she had to stop
> working at Hertz Rental Car because of the chronic pain in her neck, right
> shoulder and low back.  She has been worked-up in the past and has
> cervical spondylosis at C5-6 and C6-7.  Physical findings associated with
> that are limited neck movement by 50%.  She also has a rotator cuff tear
> in her right shoulder which is chronically and intermittently painful
> related to activity.  She also has chronic low back pain with stiffness.
> Neurologic exam has appeared normal.
>
> X-rays of this lady show degenerative disc disease at C5-6 and C6-7.
> Lumbar spine shows she has degenerative changes at L4-5 and L5-S1.
>
> This lady's job consisted of working at Hertz where she was responsible
> for the whole operation at times.  She worked rotating shifts requiring
> long hours standing and walking in the parking lot and cleaning
> automobiles, vacuuming the automobiles.  It has been my opinion that
> this lady is unable to do this job and remains the same.

(Doc. 112-2, p. 169).

On February 5, 2008, Senior Claims Manager Marianna Dileo acknowledged receipt

of the appeal and in the box labeled "Comment/Review Outcome/ Rationale/Plan" stated

as follows:

> 2/5/08 New medical received fails to conclusively support the RL's based
> on [diagnosis] of cervical [degenerative disc disease].  Only new med
> received per cm is an 1/3/08 [Attending Physician (AP)] ortho on where
> no measurable exam findings are provided to clarify limitations to
> functionality.  AP only notes [complaints] of disabling pain in neck &

[right] shoulder.  Does not describe any dermatomal findings, no ROM or
muscle weakness, no sensory loss or gait defects noted.

(Doc. 112-2, p 163).

Also, on February 5, 2008, a letter was sent to Melech acknowledging receipt of the

records from Dr. Dyas.  The letter also explained that

The appeal request is being referred to our Disability Appeals Team.  Any
additional information submitted may impact the appeal decision.
Therefore, we ask that you carefully review the enclosed original denial
letter dated November 29, 2007 to ensure that any and all available
medical or other documentation related to your claim has been
submitted.

(Doc. 112-2, p. 166).

On April 16, 2008, M.J. Kelly, RN, reviewed the medical records.  Kelly stated as

follows:

Review of medical [claimant] saw 2 orthos, neither exam demonstrates
loss of strength, reflexes or sensation of [upper extremity].  AP ortho Dr.
Dyas feels [claimant] has [Rotator Cuff] tear but no imaging on file.
Medical reviewed does not show severity of symptoms or exam findings
to support impairment.

(Doc. 112-2, p. 160).

On April 17, 2008, Tracy Shimko, Appeals Claim Manager, wrote Melech that the

denial had been upheld on appeal. (Doc. 112-2, p. 157-158).  Shimko identified Melech's

occupation as Station Manager which "required light demand activities according to the

[DOT]". (*Id*.)  Shimko explained as follows:

To ensure appropriate interpretation of medical documentation, a review
was completed with our Nurse Case Manager (NCM).  The NCM
commented that medical information on file clearly documents your
subjective complaints of pain in your neck, right shoulder and low back.
The MRI of your cervical spine performed June 12, 2007 showed bilateral
spondylosis of C5-C7 with foraminal encroachment.  The exam findings of
Dr. Engerson and Dr. Dyas fail to demonstrate loss of strength, reflexes or
sensation of your upper extremities.  Dr. Dyas notes you have a rotator

13

cuff tear, however, there is no imaging on file to substantiate this
diagnosis. The medical reviewed does not show severity of symptoms or
exam findings to support a total impairment from your own occupation.

In summary, a review of the medical information fails to provide evidence
of any clinical findings to negate your previously assessed level of
function. In addition the medical records do not provide documentation
to support the restrictions imposed by your physician or your inability to
function in your own occupation. Therefore, since the medical on file
does not provide Disability, we must affirm our previous decision to deny
benefits.

(Doc. 112-2, p. 157-158).

Shimko also explained that Melech may request a review and that

[i]n addition to any written comments, your request for review must
include new documentation you wish us to consider. This documentation
includes, but is not limited to: copies of office notes, test results, physical
examination reports, mental status reports, consultation reports, or any
other pertinent medical  information from May 2007 to the present."

(*Id.*)

Melech was seen by Dr. Dyas on May 22, 2008. He noted that Melech "continues to

have increasing neck pain" and injected a sensitive area at the "lower cervical region". (Doc.

112-2, p. 144). He noted that Melech was "intact neurologically" but had "some soreness,

pain and weakness in her right shoulder." (*Id.*)

Dr. Dyas recommended another MRI of the cervical spine and shoulder which was

obtained on May 23, 2008.  Melech provided a copy of the MRI results.  The radiologist

found that Melech's right shoulder did not have a rotator cuff tear but did have tendinitis or

tendinopathy and "mild osteoarthritic spurring neighboring the AC joint with peri-articular

edema." (Doc. 112-2, p. 143).   The MRI of Melech's cervical spine was interpreted as

showing

>1.  Moderate degenerative disc changes at C5-6 and C6-7 with broad
>based extruded disc resulting in mild central stenosis at each of these
>levels.
>2. Mild spondylitic disc changes at C4-5.

(Doc. 112-2, p. 143).  The C4-5 and C3-4 discs were "essentially unremarkable" and the C7-

T1 showed "mild spondylitic protruding disc" but was "otherwise unremarkable." (*Id*.) [4]

On October 10, 2008, Melech wrote LINA and requested another review of the

decision.   Melech provided records from Dr. Dyas and analyses from her treating

psychiatrist and therapist.  She also advised LINA that she was receiving Social Security

Disability Income benefits.   Melech also explained that LINA had evaluated her claim based

on the occupation of Location Manager as described in the DOT 185.167-058 but that title

was Service Manager and had different duties.  Melech asked that her disability be

evaluated based on the job she actually performed as Location Manager for Hertz and not

the DOT description for "Service Manager".[5]  (Doc. 112-2, p. 141-142).

Melech provided Dr. Dyas' notes from May 2008 and also submitted psychiatric and

therapy records from August and September 2008 and an October 1, 2008 psychiatric

evaluation report. (Doc. 112-2, p. 148-156).  The records are substantially redacted or

highlighted in a manner that most are unreadable.  The page captioned "Current Diagnosis"

shows the principal diagnosis as "mood disorder due to . . . (indicate the general medic"

(*sic*) (Doc. 112-2, p. 152).

---

[4]  Item 2 of the radiologist's impression may be incorrect.  In the report, mild spondyltic
disc protrusion was found at the C7-T1 and not at the C4-5.  The C4-5 was noted as
"essentially unremarkable."  (Doc. 112-2, p. 143).  The possible error, however, does not
affect the overall impression that Melech's degenerative disc disease was identified as
either mild or moderate.

[5]  LINA referenced DOT 185.167-058 which defines Service Manager (automotive).
http://www.occupationalinfo.org/18/185167058.html.  The only Location Manager
definition found in the DOT refers to "Location Manager (motion picture; radio-tv broad.)".

On October 15, 2008, Tracy Shimko, Appeals Claims Manager, wrote Melech to explain that accepting a second appeal is voluntary on the part of LINA and that LINA had decided not to accept Melech's second appeal.  Shimko discussed the psychiatric records received and concluded that the records did not demonstrate that Melech was psychiatrically impaired from May 2007 to the present.  Shimko discussed Dr. Dyas' records, found that they were "devoid of any physical exam findings demonstrating the severity of any motor, sensory, vascular or neurological deficits impairing [Melech's] ability to function" and stated that LINA was unable to consider the second appeal because Melech had not provided "medical documentation that would alter our previous decision." (Doc. 112-2, p. 139).   The letter also explained what type of medical documentation was necessary for a second appeal.

Melech did not file another appeal.  This action was filed on October 15, 2010.

## II.  Conclusions of Law

### A.  Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a party asserts "that a fact cannot be or is genuinely disputed", the party must

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)(B).

The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Clark*, 929 F.2d at 608 quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id*. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter. Instead, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-159, 90 S.Ct. 1598, 1608-1609 (1970).  However, "[a] moving party is entitled to summary judgment if the nonmoving party has 'failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *In re Walker*, 48 F. 3d 1161, 1163 (11thCir. 1995) quoting *Celotex Corp*., 477 U.S. at 323, 106 S. Ct. at 2552. Overall, the Court must "resolve all issues of material fact in favor of the [non-movant], and then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts." *McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) citing *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003).

B. ERISA Standard of Review [6]

ERISA provides no standard for courts reviewing the benefits decisions of plan

administrators or fiduciaries; thus, the Supreme Court established guidance for same in

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989) and *Metropolitan Life Ins. Co.*

*v. Glenn*, 554 U.S. 105 (2008).  More recently, the Eleventh Circuit has reiterated a multi-

step framework to guide lower courts when reviewing a plan administrator's benefits

decision.  This framework consists of the following "six-step expanded Firestone" test:

> (1) Apply the de novo standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" (i.e., the court disagrees
> with the administrator's decision); if it is not, then end the inquiry and affirm
> the decision.

> (2) If the administrator's decision in fact is " de novo wrong," then determine
> whether he was vested with discretion in reviewing claims; if not, end
> judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "de novo wrong" and he was vested with
> discretion in reviewing claims, then determine whether "reasonable"
> grounds supported it (hence, review his decision under the more deferential
> arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the
> administrator's decision; if reasonable grounds do exist, then determine if he
> operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict, the conflict should merely be a factor for the court to
> take into account when determining whether an administrator's decision
> was arbitrary and capricious.

*Blakenship v. Metropolitan Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011) (citing *Capone*

---

[6]  The summary judgment analysis is "applied in a modified manner in an ERISA case."
*Rogers v. Hartford Life and Accident, Ins. Co.,* 2012 WL 12883409, *1 n.2  (M.D. Ala.  April 16,
2012) (slip copy) (citing *Blankenship v. Met. Life Ins. Co.*, 644 F.3d 1350, 1354 n. 4 (11th Cir.
2011)).

*v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010) and *Williams v. BellSouth*

*Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004), overruled on other grounds by

*Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008)).  "All steps of

the analysis are 'potentially at issue' where a plan vests discretion to the plan

administrator to make benefits determinations. *See id*, at 1356 n.7.  Overall, Melech has the

burden to establish that she is entitled to benefits under the Plan.  *Watts v. BellSouth*

*Telecommunications, Inc.*, 218 Fed.Appx. 854, 856, (11th Cir. 2007).

III.  Analysis

      A.  Full and Fair Review

      In response to the motion for summary judgment, Melech argues that LINA violated

ERISA's procedural requirements and therefore the action should either be remanded to

LINA for a full and fair review or LINA should be ordered to pay the claim.  Specifically,

Melech argues that LINA's initial denial letter violated 29 C.F.R § 2560.503-1(g)(1)(i)

because LINA did not explain the rationale behind its decision but instead stated only:  "As

the medical documentation contained in your file does not support a no-work restriction

we are unable to approve your claim."  (Doc. 145,  p. 21).

      Title 29 C.F.R § 2560.503-1(g) provides for the "[m]anner and content of notification

of benefit determination."  Paragraph (g)(1)(i) states, in relevant part as follows:

> (1) Except as provided in paragraph (g)(2) of this section, the plan
> administrator shall provide a claimant with written or electronic
> notification of any adverse benefit determination. . . .  The notification
> shall set forth, in a manner calculated to be understood by the claimant--
>
> (i) The specific reason or reasons for the adverse determination;

29 C.F.R § 2560.503-1(g)(1)(i).

Review of the initial denial letter shows that it contained specific reasons for the

decision and satisfied the requirements of the regulation.  *See Ecklund v. Continental Cas.*

*Co.*, 415 F.Supp.2d 1353, 1376 (N.D.Ala. 2005) (addressing a similar argument regarding

lack of a full and fair review and finding that CAN clearly explained the reasons for denying

the claim).   After discussing the medical and therapy records, LINA explained as follows:

> Claim Summary
>
> Upon review of the documentation provided, we were unable to validate
> medical documentation which supported your inability to perform the
> material duties of your Regular Occupation.  In reviewing Dr. Engerson's
> office notes , no restrictions were noted and he concurred with Dr. Dyas
> treatment plan at that time of no work for 2 weeks.  A review of the MRI,
> while noting some flattening of the C5-6 and C6-7, noted your spine was
> in anatomic alignment with no disc pertrusion and bone marrow signal
> being within normal limits. In reviewing Dr. Dyas' notes, while
> restrictions and limitations were noted, no findings supporting a no work
> restriction were documented.  Dr. Dyas notes contained no findings which
> support his notice that you are permanently disabled.
>
> In an attempt to gather additional documentation from Dr. Dyas, our
> Nurse Case Manager contacted Dr. Dyas office on November 21, 2007 for
> clarification of his findings as they relate to your restrictions.  On
> November 26, 2007, we also contacted Dr. Dyas office and requested his
> objective findings to support his restrictions and limitations. To date, Dr.
> Dyas has not responded to either request.
>
> As the medical documentation contained in your file does not support a
> no work restriction we are unable to approve your claim.
>
> Therefore at this time we have closed your claim and no benefits are
> payable as the medical information does not support how you are unable
> to work.

(Doc. 112-2, p. 174-175).

Melech also argues that LINA's denial letter violated 29 C.F.R § 2560.503-1(g)(1)(iii)

because LINA failed to describe "what kind of additional medical information" or additional

material or information was needed and failed to explain why the material or information

was necessary.

Title 29 C.F.R § 2560.503-1(g) provides for the "[m]anner and content of notification

of benefit determination."  Paragraph (g)(1)(iii) states, in relevant part as follows:

> (1) Except as provided in paragraph (g)(2) of this section, the plan
> administrator shall provide a claimant with written or electronic
> notification of any adverse benefit determination. . . .  The notification
> shall set forth, in a manner calculated to be understood by the claimant--

> (iii) A description of any additional material or information necessary for
> the claimant to perfect the claim and an explanation of why such material
> or information is necessary;

29 C.F.R § 2560.503-1(g)(1)(iii).

As stated above, the denial letter of November 29, 2007, explained that Dr. Dyas

had not provided the information requested by LINA and explained that :

> In an attempt to gather additional documentation from Dr. Dyas, our
> Nurse Case Manager contacted Dr. Dyas office on November 21, 2007 for
> clarification of his findings as they relate to your restrictions.  On
> November 26, 2007, we also contacted Dr. Dyas office and requested his
> objective findings to support his restrictions and limitations. To date, Dr.
> Dyas has not responded to either request.

(Doc. 112-2, p. 175).

This statement was sufficient to put Melech on notice that Dr. Dyas needed to clarify

and support his findings as they related to her restrictions and limitations but he had not

done so.  Also, in the "Appeal Rights" section of the denial letter, Melech was informed as

follows:

> Appeal Rights

> If you disagree with our determination and intend to appeal this claim
> decision, you must submit a written appeal  . . .

You have the right to submit written comments as well as any new documentation you wish us to consider.  If you have additional information, it must also be sent for further review . . . .

We would be happy to consider any medical evidence which supports your total disability.  Medical evidence includes, but is not limited to: physician's office notes, hospital records, consultation reports, test result reports, therapy notes, physical and/or mental limitations (i.e., Functional Capacities Testing), etc.  These medical records should cover the period of May 2007 through the present.

(Doc. 112-2, p. 175).

The last paragraph plainly sets out the type of medical evidence Melech could provide to LINA including a specific reference to "physical and/or mental limitations" and "Functional Capacities Testing" which may support her claim of "total disability".  *Id.* Overall, Melech was given sufficient notice as to the type of medical evidence she could submit and why it was necessary, *i.e.*, to show that she was disabled.

Melech next argues that LINA violated 29 C.F.R. § 2560.503(h)(2)(iv) because it failed to "take into account" all the information she submitted for her first and second appeals.   Melech states that LINA's nurse case manager's review on appeal took two minutes and therefore, was not a meaningful review. [7]  LINA responds that it did not fail to take into account Melech's submissions.

Title 29 C.F.R § 2560.503-1(h) provides for the "[A]ppeal of adverse benefit determinations."  Paragraph (h)(2)(iv) states, in relevant part as follows:

---

[7]  The Court finds no merit to the argument that LINA's Claims Manager conducted a two minute review on April 17, 2008, before denying the appeal.  Melech acknowledges that the appeal was assigned on April 15, 2008, and that the decision was made on April 17, 2008, but she overlooks the date "April 16, 2008" in this "Appeal Process" summary which clearly shows review taking place on April 16, 2008.  Also, it is apparent that the time entry is when the record was created.  (Doc. 112-2, 17) ("Medical Investigation Results 4/16/08 review of med w/NCM MJ Kelly . . .").

(2) Full and fair review. Except as provided in paragraphs (h)(3) and (h)(4) of this section, the claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures—

(iv) Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R § 2560.503-1(h)(2)(iv).

Review of the record indicates that there is insufficient evidence to sustain a finding that LINA failed to provide a full and fair review.  The comments and notes by the claims managers and the nurse case managers provide sufficient documentation that LINA adequately took into account the information submitted by Melech in support of her appeal.

B.  Was LINA's decision de novo wrong?

The parties do not dispute that LINA is vested with discretionary authority to determine eligibility for benefits. (Doc. 112-2, p. 125, Policy).   Therefore, the Court begins with a *de novo* review of LINA's decision based on the evidence before LINA as found in the administrative record.  (*See* supra at note 1)

Defendants argue that LINA correctly decided that Melech was not disabled because the Administrative Record did not contain medical evidence of disability which would preclude Melech from performing the material duties of her light duty occupation. Specifically, defendants point to the fact that there is no objective medical evidence to support Dr. Dyas' opinion that Melech was totally disabled.[8]  Defendants also argue that

---

[8]  In addition to the medical records from Dr. Dyas which contain his unsupported opinion, defendants point out that there was no referral for pain management, no evidence of

Melech's mental health treatment records did not indicate that she was unable to work because of a mental impairment.

The Court has reviewed the medical evidence before LINA, and finds that the decision was *de novo* correct.   Therefore, the Court need not ascertain whether the decision was arbitrary and capricious.  *Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1566 n. 12 (11th Cir.1990) ("It is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of de novo review before a reviewing court is concerned with the self-interest of the fiduciary.")

As to clinical tests to support Melech's disability, on May 18, 2007, Dr. Engerson obtained an x-ray of Melech's cervical spine and found "significant cervical (degenerative disc disease) at the 5-6 and 6-7 with some good sized osteophyties. Loss of the normal cervical lordosis associated with spasm" (Doc. 112-2, p.  237).[9]  On June 12, 2007, a cervical MRI was taken.  The radiologist noted his impression that there was now normal alignment of the cervical spine and that Melech's cervical degenerative disk disease was mild or moderate.  (Doc. 112-2, p. 339).  A year later, on May 23, 2008, Melech's cervical MRI was interpreted as showing mild or moderate cervical degenerative disc changes and mild central stenosis. (Doc. 112-2, p. 143).

While Dr. Engerson interpreted the initial X-Ray as showing significant cervical degenerative disc disease with loss of normal cervical lordosis, the MRIs taken June 12, 2007 and May 23, 2008, were interpreted to show only mild or moderate cervical disc

---

medication interfering with Melech's cognitive or functional abilities, and no evidence that she was referred for surgical evaluation.
[9]  Although the physical therapy notes are largely unreadable, one of the initial therapy goals was to improve Melech's "cervical stability posture".  Limited range of motion and fair strength in the cervical spine were noted.  (Doc. 112-2, p.  266-267)

disease with normal cervical alignment. Dr. Dyas' opinion that Melech was totally disabled from her light work occupation was not supported by these tests without some explanation of how the disease affected her functional abilities.

As to Melech's right shoulder, there appears to have been only one test in LINA's records: an MRI taken May 23, 2008. The MRI was interpreted as ruling out a rotator cuff tear but showing tendinitis or tendinopathy with "mild osteoarthritic spurring neighboring the AC joint with peri-articular edema." (Doc. 112-2, p. 143). Dr. Dyas' opinion that Melech could not work because of a torn rotator cuff was not supported by this test.

As to Melech's lumbar disc disease, the only clinical test is discussed in the January 3, 2008 letter Dr. Dyas wrote LINA. He stated that Melech's x-ray showed "degenerative changes at L4-5 and L5-S1". (Doc. 112-2, p. 169). "Changes" do not support a finding of total disability from light work.

As to functional limitations identified by the examining physicians:[10] On May 10, 2007, Dr. Dyas took Melech off work for two weeks and referred her for physical therapy. (Doc. 112-2, p. 339). On May 18, 2007, Dr. Engerson found full range of motion of Melech's right shoulder with "mild impingement signs", and "some pain with resisted abduction and forward elevation". He also found that Melech's "gross motor and sensory testing upper extremities basically [within normal limits]." He agreed with Dr. Dyas' treatment plan. (Doc. 112-2, p. 237). On June 7, 2007, Dr. Dyas noted that Melech was "intact neurologically." (Doc. 112-2, p 339). On September 13, 2007, Dr. Dyas noted that Melech "still can't work." (Doc. 112-2, p. 339). On October 12, 2007, Dr. Miller found all "Joints

---

[10] In a readable section of their notes, the physical therapists indicated that Melech's cervical mobility and pain were improving although she was still stiff. (Doc. 112-2, p. 252).

show full range of motion" and that Melech's neck was "Supple.  No [jugular vein distension]. Nontender." (Doc. 112-2, p. 193).[11]

On January 3, 2008, in Dr. Dyas' letter to LINA, he stated: "Physical findings associated with [cervical spondylosis at C5-6 and C6-7] are limited neck movement by 50%".  He also explained incorrectly that Melech "has a rotator cuff tear in her right shoulder which is chronically and intermittently painful to activity".  As to her lumbar spine, he identified "chronic low back pain with stiffness."  Again, Melech's neurological exam was normal. (Doc. 112-2, p. 169).  On May 22, 2008, Dr. Dyas noted that Melech was "intact neurologically" but had "some soreness, pain and weakness in her right shoulder." (Doc. 112-2, p. 144).

Despite Dr. Dyas' opinion that Melech was permanently and totally disabled, the only findings which could reasonably be interpreted as functional limitations are Dr. Engerson finding of "mild impingement signs" and "some pain with resisted abduction and forward elevation" in Melech's right shoulder (May 18, 2007);  Dr. Dyas' finding of "some soreness, pain and weakness" in Melech's right shoulder (May 22, 2008); and Dr. Dyas' finding of "stiffness" in the lumbar spine, a 50% limitation on neck movement and pain in Melech's right shoulder related to activity (January 3, 2008).  Dr. Dyas' limitations contrast with Dr. Engerson's finding of a full range of motion in all upper extremities and Dr. Miller's finding of full range of motion in all joints and supple neck.  Also, Dr. Dyas' finding of 50% limitation on neck movement does not explain how that renders Melech totally and permanently disabled or unable to perform her job. [12] Therefore, the decision to deny

---

[11]  The Court acknowledges that Dr. Miller is not an orthopedic physician.

[12]  Dr. Dyas' opinion appears to be based on two different work descriptions – First, he stated that Melech worked at a computer 50 hours per week (Doc. 112-2, p. 339).  Later he explained that she "worked rotating shifts requiring long hours standing and walking in the parking lot and cleaning automobiles, vacuuming the automobiles."  (Doc. 112-2, p. 169).

Melech's claim for long term disability benefits is not *de novo* wrong because Melech failed to sustain her burden to show she could not, because of functional limitations, perform her job as it is normally performed in the general labor market.

IV. Conclusion

In accordance with the foregoing, defendants' motion for summary judgment is

**GRANTED.**

DONE and ORDERED this the 18th day of September, 2012.

s/ Kristi K. DuBose
KRISTI K. DuBOSE
STATES DISTRICT JUDGE

---

Melech described her "Major Duties" as "Doing reports, handling customers, renting cars, making schedules for employees, safety issues". (Doc. 112-2, p. 186).  She described her "Minor Duties" as "Moving cars, cleaning & vacuuming cars, preparing cars where necessary; inventory."  (*Id*).  She used a computer, copy machine, fax, and a vacuum. (*Id*.)  Thus, it appears that she did not work 50 hours per week at the computer and did not spend "long hours standing and walking in the parking lot" or cleaning and vacuuming cars.