**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DIANE G. MELECH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.: 10-00573-KD-M** |
| | ) | |
| **LIFE INSURANCE COMPANY OF** | ) | |
| **NORTH AMERICA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This action is before the Court on Defendants Life Insurance Company of North America, Hertz Corporation, and Hertz Corporation Pension and Welfare Committee's motion for summary judgment, memorandum of law in support, proposed determinations of undisputed facts and conclusions of law, and evidentiary submissions (docs. 196-199), Plaintiff Diane Melech's response in opposition and appendix (docs. 209, 210, 238 (under seal)), and Defendants' reply (doc. 215); and Defendants' motion to strike Plaintiff's exhibits submitted in support of her response,  Plaintiff's response to the motion to strike and Defendants' reply (docs. 216, 220, 237).   Upon consideration and for the reasons set forth herein Defendants' motion for summary judgment is granted and Defendants' motion to strike is granted.

I. Background

Plaintiff Diane Melech was employed as a Location Manager for Hertz Corporation.  She was the beneficiary of an employee welfare benefit plan provided by Hertz. As part of the Plan, Plaintiff was the beneficiary of a disability insurance policy, which was insured and administered by Defendant Life Insurance Company of North America (LINA). Plaintiff applied for long-term

disability under the Plan on basis she could no longer perform her job because of pain in her neck, shoulder, and back, headaches, and numbness in her right arm and hand.  In November 2007, LINA denied the application and Plaintiff appealed.  At that time, Plaintiff's application for Social Security Disability Income was pending before the Social Security Administration.  In February 2008, she was awarded SSDI benefits.  Plaintiff notified LINA of the award of benefits. LINA subsequently denied both of Plaintiff's administrative appeals.

In October 2010, Plaintiff filed her complaint for legal and equitable relief for violations of the Employee Retirement Income Security Act (ERISA), pursuant to 29 U.S.C. § 1132(a)(1). Initially, Plaintiff brought Count One for failure to provide plan documents.  However, Plaintiff withdrew that claim for relief in her response to the motion for summary judgment. Plaintiff's remaining Count 2 alleged a claim for long-term disability benefits pursuant to 29 U.S.C. § 1132(a)(1(B).  Plaintiff alleged that she was disabled under the terms of the Plan.  The Court granted the Defendants' motion for summary judgment on basis that the decision to deny Plaintiff's claim for long-term disability benefits was not *de novo* wrong. The Court also granted judgment in Defendants favor on Plaintiff's argument that the action should be remanded, or benefits awarded, because she did not receive a full and fair review of her claim.

Plaintiff appealed the decision.  The Eleventh Circuit Court of Appeals vacated the decision and remanded to this Court with instructions to remand the matter to Defendants, specifically, LINA. The Eleventh Circuit explained as follows:

> We are similarly struck by the procedural unfairness created by LINA's approach.
> We conclude that LINA's treatment of Melech's SSA application is inconsistent
> with the fundamental requirement that an administrator's decision to deny benefits
> must be based on a complete administrative record that is the product of a fair

claim-evaluation process. Because LINA's decision to deny benefits here was
based on an administrative record that did not contain the information from
Melech's SSA file, the proper course of action is to remand Melech's claim to
LINA rather than to evaluate the merits of Melech's claim for benefits under the
Policy using evidence that LINA did not consider. See Levinson v. Reliance
Standard Life Ins. Co., 245 F.3d 1321, 1330 (11th Cir. 2001) ("[A]s a general
rule, remand to the plan fiduciary is the appropriate remedy when the plan
administrator has not had an opportunity to consider evidence on an issue.")
(citing Jett, 890 F.2d at 1140)).

Therefore, we vacate the District Court's grant of summary judgment in favor of
LINA and remand to the District Court with instructions to remand the matter to
LINA. In doing so, we do not pre-judge the ultimate outcome. LINA may be able
to draw a principled distinction between its own standards for granting disability
benefits under the Policy and the SSA's standards for awarding SSDI. All we
require of LINA is to decide Melech's claim with the full benefit of the results
generated by the SSA process that it helped to set in motion.

(Doc. 172, p. 26-27) (footnote omitted).

On remand, Defendant LINA considered the evidence from Plaintiff's existing file, the

SSA file, and the SSA decision as well as additional review by a psychiatrist, orthopedic

surgeon, vocational rehabilitation counselor and an appeal specialist.  LINA denied Plaintiff's

claim.  This action was reopened and Plaintiff filed her first amended complaint.

Plaintiff raises four claims in her first amended complaint.  In Count I, she claims long-

term disability benefits.  In Count II, she claims attorney's fees and expenses incurred in the

recent claim decision on remand.  In Count III, she claims attorney's fees and expenses incurred

obtaining the reversal in the Eleventh Circuit. Count IV, wherein Plaintiff claimed failure to

provide documents, has been dismissed.

Defendant filed its motion for summary judgment as to Count I, on basis that Plaintiff does not qualify for long-term disability benefits. Plaintiff responds and seeks denial of Defendant's motion and moves the Court to enter summary judgment in her favor.

II. Findings of fact[1]

    A. The Policy

LINA issued Group Policy VDT-960024 to The Hertz Corporation. The Hertz Corporation is the Plan Sponsor and the Plan Administrator for the Plan. LINA insures the Policy and serves as the claims administrator with responsibility for adjudicating claims for long-term disability benefits made by participants of the Plan (doc. 112-1, p. 2-3, Affidavit of Kellie Downey, Senior Operations Representative at LINA) (doc. 112-2, First Administrative Record).

In relevant part, the Policy states as follows:

> The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all other terms and conditions of the policy. He or she must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before

---

[1] Plaintiff responded to the Defendants' suggested determinations of undisputed facts by stating as follows: "Melech submits that the records and documents upon which this Court must base its review in this ERISA case speak for themselves. To the extent LINA's 'Proposed Determinations of Undisputed Fact and Conclusions of Law' are inconsistent with those documents, she denies those assertions of fact and law and submits her own statement below." (Doc. 209) As Defendants' point out, Local Rule 7.2(b) for the Southern District of Alabama in effect at the time of response, stated that the opposing party "shall point out the disputed facts appropriately referenced to the supporting document or documents filed in the action. Failure to do so will be considered an admission that no material factual dispute exists." S.D. Ala. LR 7.2(b). Defendants assert that Plaintiff's statement of facts should be stricken and the Defendants' facts adopted in full. (Doc. 215, p. 3) However, the Court denies the Defendants' request to strike. But, the Court will not compare Defendants' statement of facts to the "records and documents upon which this Court must base it review" and figure out the inconsistencies that Plaintiff has denied. That was Plaintiff's responsibility. Additionally, the Southern District of Alabama adopted new local rules effective August 1, 2015. As to summary judgment, "[t]he Court will deem uncontroverted material facts to be admitted solely for the purpose of deciding the motion for summary judgment." S.D. Ala. Civ. LR 56(e).

benefits will be paid.  The Disability Benefit is shown in the Schedule of
Benefits.

The Insurance Company will require continued proof of the Employee's Disability
for benefits for continue.

(Doc. 112-2, p. 125, Policy)   "The Elimination Period is the period of time an Employee must be

continuously Disabled before Disability Benefits are payable." (Doc. 112-2, p. 125) The

Elimination Period lasts 26 weeks. (Doc. 112-2, p. 101)

The Policy defines "Total Disability" as follows:

Definition of Disability/Disabled

The Employee is considered Disabled if, solely because of Injury or Sickness, he
or she is:

> 1. unable to perform the material duties of his or her Regular
> Occupation; and

> 2. unable to earn 80% or more of his or her Indexed Earnings from
> working in his or her Regular Occupation.

(Doc. 112-2, p. 110, 118)

B. Plaintiff's Regular Occupation

 The Policy defines "Regular Occupation" as "[t]he occupation the Employee routinely

performs at the time the Disability begins.  In evaluating the Disability, the Insurance Company

will consider the duties of the occupation as it is normally performed in the general labor market

in the national economy. It is not work tasks that are performed for a specific employer or at a

specific location." (Doc. 112-2, p. 136)

LINA identified Plaintiff as a "Service Manager" as found in The Dictionary of

Occupational Titles, 4th ed., Rev. 1991, at listing 185.167-058. (Doc. 197-2, p. 18)   The

occupation is considered Light Work, which requires as follows:

> Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force
> frequently, and/or a negligible amount of force constantly (Constantly: activity
> or condition exists 2/3 or more of the time) to move objects. Physical demand
> requirements are in excess of those for Sedentary Work. Even though the weight
> lifted may be only a negligible amount, a job should be rated Light Work: (1)
> when it requires walking or standing to a significant degree; or (2) when it
> requires sitting most of the time but entails pushing and/or pulling of arm or leg
> controls; and/or (3) when the job requires working at a production rate pace
> entailing the constant pushing and/or pulling of materials even though the weight
> of those materials is negligible.

DOT at Appendix C, Part IV, Physical Demands – Strength Rating.

Defendant Hertz describes Plaintiff's occupation as Location Manager.  The physical

requirements were:

| | |
|---|---|
| Sitting | 4 hours |
| Walking | 8 hours |
| Climbing | 0 hours |
| Pushing/Pulling | 0 hours |
| Lifting | 2 hours |
| Bending/Twisting | 3 hours |
| Driving | 8 hours |

(Doc. 112-2, p. 354)

Plaintiff described the "Major Duties" of her job as "Doing reports, handling customers,

renting cars, making schedules for employees, safety issues" (doc. 112-2, p. 186).  She described

the "Minor Duties" of her job as "Moving cars, cleaning & vacuuming cars, preparing cars where

necessary; inventory." (*Id*).  She used a computer, copy machine, fax and a vacuum. (*Id*.)

C. Plaintiff's initial claim

Plaintiff began working for Hertz Corporation on June 3, 1977 and worked full time as a Location Manager.  Plaintiff was responsible for managing the service lot and its rental counter. (Doc. 145, p. 5)  Her duties required that she be able to sit for four hours, walk for eight hours, stand for eight hours, lift for two hours, bend or twist for thee hours and drive for eight hours. (Doc. 112-2, p. 354) Plaintiff's last day of employment was May 8, 2007. (Doc. 112-2, p. 366) Plaintiff left work with complaints of neck, shoulder and back pain, headaches, and numbness in her right arm and hand. (Doc. 112-2, p. 184)

Dr. Edmund C. Dyas IV, Plaintiff's orthopedic treating physician, examined Plaintiff on May 10, 2007, for complaints of chronic neck and right shoulder pain. Dr. Dyas noted as follows:

> Patient is having more and more neck and shoulder pain on the right.  She's got bad degenerative disc disease at 5-6, 6-7 with stenosis.  She's also got frank tendinitis in the right shoulder.  She works with a computer 50 hours a week, and I think that's entirely too much for her.  We'll take her off work 2 weeks, put her on PT [physical therapy] and we injected the subscapular bursa today and renewed her Lortab 5.  We'll see her back in 2 weeks.

(Doc. 112-2, p. 339) (bracketed text added)

From May 14, 2007 through June 20, 2007, Plaintiff went to physical therapy at Fleming Rehab and Sports Medicine two to three times per week.  (Doc. 112-2, p. 249-267).  The physical therapists' assessment notes are generally unreadable either because of poor handwriting or use of symbols and acronyms. However, an overall review indicates that Plaintiff initially had tenderness in the cervical spine, reduced strength ("3" out of "5") and limited range of motion in her neck and right shoulder.  The therapist's goal was to increase the range of motion and

strength and improve Plaintiff's posture, which was initially noted as "head forward", "shoulders rounded" and "c spine flexed". (Doc. 112-2, p. 266-267).  The notes indicate that Plaintiff attended therapy in May through June 20, 2007, and was to continue treatment for two to three more weeks, but did not. (Doc 112-2, p. 249-250).

Plaintiff's last physical therapy session was June 20, 2007, and there is no indication that she resumed any physical therapy treatment after that date.  The therapist wrote "Pt. notes that she had a headache yesterday" but the remainder of the assessment is unreadable. (Doc. 112-2, p. 250).  One readable assessment was written on June 18, 2007, Plaintiff's next to last session – "Pt reports that she got a bad headache Fri. that started at base of head" "Pt. tol therap well. No complaints of pain or discomfort." (Doc. 112-2, p. 251)  Another readable assessment was written on June 13, 2007 – "Pt cont. to note pain in [cervical] spine"  "Overall cervical mobility and [head ache] pain are improving.  Though still stiff esp[ecially] the upper C & T spine.  Needs to cont[inue] to advance postural program to help [decrease] strain ___?__ C spine." (Doc. 112-2, p. 252)

Hertz Corporation referred Plaintiff to Dr. Todd Engerson, an orthopedic physician, for an independent medical examination and a second opinion.  On May 18, 2007. Dr. Engerson noted as follows:

> [Physical Examination]  Healthy appearing lady.  She has some cervical spasm, some tenderness diffusely in the interscapular region, upper trapezius on the right side.  Full [range of motion] of her right shoulder with mild impingement signs. Does have some pain with resisted abduction and forward elevation.  Gross motor and sensory testing upper extremities basically [within normal limits].

X-Ray C-spine show significant cervical [degenerative disc disease] at 5-6 and 6-7 with some good sized posterior osteophytes, loss of the normal cervical lordosis associated with spasm.

[Impression]: Cervical [degenerative disc disease] with exacerbation.

[Recommendation]: I agree with Dr. Dyas' treatment and have written a note back to that effect.  See Dr. Dyas in follow-up.

(Doc. 112-2, p. 237) (bracketed text added)

Dr. Dyas saw Plaintiff again on Thursday, May 24, 2007, he noted as follows:

A little better with her physical therapy and rest.  We will keep her off until next Tuesday and see her back here in two weeks.

(Doc. 112-2, p. 339)  From this an implication arises that Dr. Dyas kept Plaintiff off work until

"next Tuesday", which was May 28, 2007.

Plaintiff returned to Dr. Dyas on June 7, 2007.  He noted as follows:

Patient is having more pain in her neck, shoulder and arm.  She is intact neurologically.  She is depressed about her job situation and I think that we need to get a MRI scan of her neck to see if it is any worse as it has been over a year.  I also think that she cannot go back to this job.

(Doc. 112-2, p. 339) (underlining added)

Also, on June 7, 2007, Dr. Dyas wrote as follows:

To Whom it May Concern

The above captioned patient is under my care. She is permanently and totally disabled.  She cannot return to her present job. . . .

(Doc. 112-2, p. 340)

On June 12, 2007, the MRI of Melech's cervical spine, that Dr. Dyas had ordered, showed:

Clinical History: Neck and Right Upper Extremity Pain.

Findings:  Spin-echo sagittal, axial and STIR sagittal images were
obtained.  The cervical spine is in anatomic alignment.  There is mild
flattening of the C5-6 and C6-7 intervertebral disc without evidence of a
disc protrusion and there is also bilateral spondolytic change at these 2
levels with foraminal encroachment.  No other abnormality of the cord is
seen.  Bone marrow signal is within normal limits.

Impression:  Bilateral spondylosis C5-6 and C6-7 with foraminal
encroachment.

(Doc. 112-2, p. 339)

Plaintiff did not return to Dr. Dyas until September 13, 2007.  Dyas noted as follows:

Continues to have disabling pain in her neck and shoulder.  I injected the
trigger area in her neck and renewed her medicine today.  We will see her
back here as needed.  She still can't work with all of these problems.

(Doc. 112-2, p. 311, 339)

On or about October 2, 2007, Plaintiff applied for long-term disability benefits with

LINA and her initial claims manager was Eric Poliziani. (Doc. 112-2, p. 4 "Primary Claim File.")

Her occupation was identified as "Station Manager" with an occupational category of "Office and

Clerical". (Doc. 112-2, p. 66)  Her medical condition was identified as "severe degenerative disk

disease". (*Id*.)  On or about October 4, 2007, a letter was mailed to Plaintiff, which confirmed

receipt of the claim, explained certain aspects of the claims process, and requested additional

information. (Doc. 112-2, p. 83-84)

On October 12, 2007, Plaintiff saw Dr. Jonathan Miller with complaints of abdominal

pain and diarrhea. (Doc. 112-2, p. 192)  Dr. Miller noted her history of "some degenerative disk

disease, some hand pain, some anxiety and insomnia" and her current medications were

"Prevacid, Xanax, Soma, occasional Lortab, fish oils and some vitamin E".  (*Id*.)  On physical

examination, Dr. Miller noted that all "[j]oints show full range of motion" and that Plaintiff's

neck was "Supple.  No [jugular vein distension].  Nontender." (*Id*.)  Dr. Miller prescribed

Ambien for insomnia instead of Xanax and Nexium for gastroesophageal reflux disease. (*Id*. p.

193)

On October 12, 2007, Poliziani faxed a letter and form to Dr. Dyas asking that he provide

office notes, answer questions regarding prognosis for recovery, return to work, and referral to

other specialist, and also asking Dr. Dyas to "help [LINA] understand [Melech's] current level of

functional ability by completing the enclosed Physical Abilities Assessment form." (Doc. 112-2,

p. 342-345)

On October 18, 2007, Dr. Dyas faxed the form and letter back to Poliziani.  On the face

of the letter Dr. Dyas appears to have written "Pt is permanently & totally disabled."  He did not

complete the Physical Abilities Assessment form but did sign it. (Doc. 112-2, p. 341-345)

On October 24, 2007, Poliziani contacted Fleming Rehab and Sports Medicine.  Poliziani

asked for rehabilitation notes from May 2007 to the present, prognosis, and any return to work

plan.  (Doc. 112-2, p. 322-323)  He also asked for "help [to] understand [Melech's] current level

of functional ability by completing the enclosed Physical Abilities Assessment form." (*Id.*)

Fleming Rehab responded by letter stating that  "we have not seen Ms. Melech since June 20,

2007 and cannot make any recommendations or assessments at this time" and that "we will need

to re-evaluate her or schedule a functional capacity evaluation (FCE) to determine her work

ability." (Doc. 112-2, p. 321)  No FCE was obtained.

On November 6, 2007, Plaintiff completed a "Disability Questionnaire & Activities of

Daily Living" form for LINA. (Doc. 112-2, p. 184-187)  Plaintiff stated that "her neck hurts very

11

badly when sitting at computer causing severe headaches and neck pain, right arm and hand goes numb. Lower back hurts when standing or bending. For period of time using phone causes pain in neck." (Doc. 112-2, p. 185)  She stated that she could drive "as needed" and regularly cooked, cleaned, shopped, did laundry, read, watched television, and attended church.  (*Id*.)  For recreation she stated that she "watched football, visit with family & friends, go out to eat, lay on beach during summer." (*Id*.)  She also reported that she attended to all her personal grooming and dressing needs.  (*Id*.)  As to exercise, she stated that her therapist had told her to "___ with elastic bands." (Doc. 112-2, p. 186)   Her medications were identified as Nexium once daily, Lortab as needed, Soma as needed, Xanax at night, and Estrace once daily. (Doc. 112-2, p187)   She indicated her visits with Dr. Dyas were on an "as needed" basis. (Doc. 112-2, p. 187)

On November 13, 2007, Poliziani "sent a follow up request" to Dr. Dyas.  Poliziani requested "objective findings, copies of June 2007 MRI, [patient] reports, medication, PAA [physical abilities assessment] and office visit notes beyond [last office visit] in file of 9/13/07." (Doc. 112-2, p. 36)   Dr. Dyas did not respond to the request.

On November 20, 2007, Jeffrey Weber, Nurse Case Manager, reviewed Plaintiff's records and found that

> [Claimant] treating for neck pain due to [degenerative disc disease].  Cervical MRI is unremarkable. Dr. Dyas states [claimant] is totally & permanently disabled due to pain.  [Record] does not support no work.

(Doc. 112-2, p. 183)

On November 26, 2007, Weber faxed a letter to Dr. Dyas requesting clarification as to Plaintiff's "condition and work status." (Doc. 112-2, p. 79-80).  The letter asked Dr. Dyas to advise whether he had seen Plaintiff since September 13, 2007, to "provide objective findings to

support Ms. Melech being permanently and totally disabled", and explained that "an 'off work'

note is not sufficient documentation to certify disability." (*Id*.)

On November 29, 2007, Marianna DiLeo conducted a "second eye review" of Plaintiff's

claim. (Doc. 112-2, p/ 24-25)  She reviewed the claims processing including such procedures as

reviewing and addressing eligibility and functionality, and found that an appropriate decision had

been made and approved the decision letter.

On November 29, 2007, Poliziani wrote Plaintiff that LINA was unable to approve her

claim. (Doc. 112-2, p. 172-176)   Poliziani explained that Plaintiff's job of Location Manager

was categorized as Light Work in the U.S. Department of Labor Dictionary of Occupational

Titles (DOT) and that LINA must look at Plaintiff's occupation as defined in the DOT and not

her specific job.  He summarized the medical evidence including the June 12, 2007 MRI results

and other evidence including Plaintiff's statement of daily activities that had been reviewed.

Poliziani explained as follows:

> Claim Summary
>
> Upon review of the documentation provided, we were unable to validate medical
> documentation which supported your inability to perform the material duties of
> your Regular Occupation.  In reviewing Dr. Engerson's office notes , no
> restrictions were noted and he concurred with Dr. Dyas treatment plan at that time
> of no work for 2 weeks.  A review of the MRI, while noting some flattening of the
> C5-6 and C6-7, noted your spine was in anatomic alignment with no disc
> pertrusion and bone marrow signal being within normal limits. In reviewing Dr.
> Dyas' notes, while restrictions and limitations were noted, no findings supporting
> a no work restriction were documented.  Dr. Dyas notes contained no findings
> which support his notice that you are permanently disabled.
>
> In an attempt to gather additional documentation from Dr. Dyas, our Nurse Case
> Manager contacted Dr. Dyas office on November 21, 2007 for clarification of his
> findings as they relate to your restrictions.  On November 26, 2007, we also

contacted Dr. Dyas office and requested his objective findings to support his restrictions and limitations. To date, Dr. Dyas has not responded to either request.

As the medical documentation contained in your file does not support a no work restriction we are unable to approve your claim.

Therefore at this time we have closed your claim and no benefits are payable as the medical information does not support how you are unable to work.

(Doc. 112-2, p. 174-175)

Plaintiff was advised of her right to appeal in the denial letter.  The letter explained that

Appeal Rights

If you disagree with our determination and intent to appeal this claim decision, you must submit a written appeal  . . .

You have the right to submit written comments as well as any new documentation you wish us to consider.  If you have additional information, it must also be sent for further review . . . .

We would be happy to consider any medical evidence which supports your total disability.  Medical evidence includes, but is not limited to: physician's office notes, hospital records, consultation reports, test result reports, therapy notes, physical and/or mental limitations (i.e., Functional Capacities Testing), etc.  These medical records should cover the period of May 2007 through the present.

(Doc. 112-2, p. 175).

Plaintiff returned to Dr. Dyas on January 3, 2008.  At this time, she had not seen Dr.

Dyas since September 13, 2007.  His notes state that

Patient continues to have disabling pain in her neck and right shoulder. She has degenerative disc disease in her neck with cervical spondylosis.  I think she has a rotator cuff tear in the right shoulder.  We injected about the base of her neck today.  We renewed her medication Lortab and Soma.

(Doc. 112-2, p. 170).

14

On January 31, 2008, Plaintiff appealed the decision. (Doc. 112-2, p. 168)   She

submitted office notes and a letter from Dr. Dyas dated January 3, 2008, wherein he explained as

follows:

> This 57 year old white female has been followed since she had to stop
> working at Hertz Rental Car because of the chronic pain in her neck, right
> shoulder and low back.  She has been worked-up in the past and has cervical
> spondylosis at C5-6 and C6-7.  Physical findings associated with that are
> limited neck movement by 50%.  She also has a rotator cuff tear in her right
> shoulder which is chronically and intermittently painful related to activity.
> She also has chronic low back pain with stiffness.  Neurologic exam has
> appeared normal.
>
> X-rays of this lady show degenerative disc disease at C5-6 and C6-7.  Lumbar
> spine shows she has degenerative changes at L4-5 and L5-S1.
>
> This lady's job consisted of working at Hertz where she was responsible for
> the whole operation at times.  She worked rotating shifts requiring long hours
> standing and walking in the parking lot and cleaning automobiles, vacuuming
> the automobiles.  It has been my opinion that this lady is unable to do this job
> and remains the same.

(Doc. 112-2, p. 169)

On February 5, 2008, Senior Claims Manager Marianna Dileo acknowledged receipt of

the appeal and in the box labeled "Comment/Review Outcome/ Rationale/Plan" stated as follows:

> 2/5/08 New medical received fails to conclusively support the RL's based on
> [diagnosis] of cervical [degenerative disc disease].  Only new med received
> per cm is an 1/3/08 [Attending Physician (AP)] ortho on where no measurable
> exam findings are provided to clarify limitations to functionality.  AP only
> notes [complaints] of disabling pain in neck & [right] shoulder.  Does not
> describe any dermatomal findings, no ROM or muscle weakness, no sensory
> loss or gait defects noted.

(Doc. 112-2, p 163) (*sic*) (bracketed text added).

On April 16, 2008, M.J. Kelly, RN, reviewed the medical records.  Kelly stated as

follows:

> Review of medical [claimant] saw 2 orthos, neither exam demonstrates loss of
> strength, reflexes or sensation of [upper extremity].  AP ortho Dr. Dyas feels

> [claimant] has [Rotator Cuff] tear but no imaging on file.  Medical reviewed does not show severity of symptoms or exam findings to support impairment.

(Doc. 112-2, p. 160)

On April 17, 2008, Tracy Shimko, Appeals Claim Manager, wrote Plaintiff that the denial had been upheld on appeal. (Doc. 112-2, p. 157-158).  Shimko identified Plaintiff's occupation as Station Manager which "required light demand activities according to the  [DOT]".

(*Id*.)   Shimko explained as follows:

> To ensure appropriate interpretation of medical documentation, a review was completed with our Nurse Case Manager (NCM).  The NCM commented that medical information on file clearly documents your subjective complaints of pain in your neck, right shoulder and low back.  The MRI of your cervical spine performed June 12, 2007 showed bilateral spondylosis of C5-C7 with foraminal encroachment.  The exam findings of Dr. Engerson and Dr. Dyas fail to demonstrate loss of strength, reflexes or sensation of your upper extremities.  Dr. Dyas notes you have a rotator cuff tear, however, there is no imaging on file to substantiate this diagnosis.  The medical reviewed does not show severity of symptoms or exam findings to support a total impairment from your own occupation.
>
> In summary, a review of the medical information fails to provide evidence of any clinical findings to negate your previously assessed level of function.  In addition the medical records do not provide documentation to support the restrictions imposed by your physician or your inability to function in your own occupation.  Therefore, since the medical on file does not provide Disability, we must affirm our previous decision to deny benefits.

(Doc. 112-2, p. 157-158).

Shimko also explained that Plaintiff may request a review and that

> [i]n addition to any written comments, your request for review must include new documentation you wish us to consider.  This documentation includes, but is not limited to: copies of office notes, test results, physical examination reports, mental status reports, consultation reports, or any other pertinent medical  information from May 2007 to the present."

(*Id*.)

Dr. Dyas examined Plaintiff on May 22, 2008.  He noted that she "continues to have increasing neck pain" and injected a sensitive area at the "lower cervical region". (Doc. 112-2, p. 144)  He noted that Plaintiff was "intact neurologically" but had "some soreness, pain and weakness in her right shoulder." (*Id*.)

Dr. Dyas recommended another MRI of the cervical spine and shoulder, which was obtained on May 23, 2008.   Plaintiff provided a copy of the MRI results.  As to her right shoulder, the radiologist found "no evidence of rotator cuff tear" but instead the test was "consistent with tendinitis or tendinopathy" of the shoulder, and "mild osteoarthritic spurring neighboring the AC joint with peri-articular edema." (Doc. 112-2, p. 143)

The report of the MRI of Plaintiff's cervical spine stated as follows:

There is a diffuse degenerative disc desiccation with moderate spondylitic disc space narrowing at C5-6 and C6-7.  The C7-T1 level demonstrates mild spondylitic protruding disc and is otherwise unremarkable.  There is a broad based central disc extrusion at C6-7 resulting in mild central stenosis with left greater than right foraminal protruding disc.  The central canal is narrowed to approximately 9mm.  There is a right paracentral disc extrusion at C5-6 resulting in mild central stenosis.  Disc material minimally contacts the right ventral cord. The canal is narrowed to 9mm.  There is right foraminal spondylitic spurring. The C4-5 and C3-4 levels are essentially unremarkable.

Impression:

1.  Moderate degenerative disc changes at C5-6 and C6-7 with broad based extruded disc resulting in mild central stenosis at each of these levels.

2.  Mild spondylitic disc changes at C4-5. [2]

---

[2]  This may be incorrect.  In the report, a mild spondyltic disc protrusion was found at the C7-T1, but not at the C4-5, which was noted as "essentially unremarkable."  (Doc. 112-2, p. 143)  The possible error, however, does not affect the overall impression that Plaintiff's degenerative disc disease was identified as either mild or moderate.

(Doc. 112-2, p. 143)

On October 10, 2008, Plaintiff wrote LINA and requested another review of the decision. Plaintiff provided Dr. Dyas' notes from May 2008 and reports from her treating psychiatrist and therapist.  She advised LINA that she was receiving Social Security Disability benefits.   Plaintiff stated that

> According to your job description, I am being evaluated using the duties associated with service manager, however the duties listed do not describe the job I performed for Hertz.  While the job title you received from my employer was that of Location Manager, CIGNA evaluated my claim using U.S. Department of Labor [Dictionary] of Occupational Titles 185.167-058.  This description is for service manager which does not describe the job of location manager.  I request that CIGNA evaluate the disability I have based on the job description that correctly explains the job for which I performed.

(Doc. 112-2, p. 141-142) [3]

Plaintiff submitted psychiatric records from August and September 2008 office visits with a therapist, Kim Dyson at AltaPointe Health Systems, and the most recent October 1, 2008 psychiatric evaluation. (Doc. 197-3, p. 85-91)[4]  The page captioned "Current Diagnosis" shows the principal diagnosis as "mood disorder due to . . . (indicate the general medic" (*sic*)) (Id. p. 87).  Relevant to her claim for disability based upon physical limitations, the therapist noted Plaintiff "had a series of back problems related to her job and finally went out on disability" and

---

[3]  LINA referenced DOT 185.167-058, which defines Service Manager (automotive). http://www.occupationalinfo.org/18/185167058.html.

[4]  The mental health examination report dated October 1, 2008 was first submitted to the Court in June of 2012.  That copy was substantially redacted or highlighted in a manner that it was unreadable.  After remand, the first administrative record was submitted again.  This time, the document is legible.  (Compare Doc. 112-2, p. 150-151, 153-156 with Doc. 197-3, p. 85-86, 89-91)

noted Plaintiff's report that "her level of pain is high and coupled with insomnia feels exhausted all of the time." (Id., p. 88-89)

As to daily activities, Plaintiff reported that she could care for herself.  For recreational activities, she "spends time with boyfriend, adult children and her dog, loves music, the beach and going fishing". (Id., p. 89) The psychiatrist Dr. Bland diagnosed mood disorder and "C-spine injury" and recommended a change from Xanax[5] to Klonopin, start Lexapro, and return in six weeks for a follow-up.  (Id., p. 90)  Plaintiff did not return for any further psychiatric treatment.

On October 15, 2008, Tracy Shimko, Appeals Claims Manager, wrote Plaintiff to explain that accepting a second appeal is voluntary on the part of LINA and that LINA had decided not to accept Plaintiff's second appeal.  Shimko discussed the psychiatric records received and concluded that the records did not demonstrate that Plaintiff was psychiatrically impaired from May 2007 to the present.  Shimko wrote as follows:

> We received on October 15, 2008 your appeal request along with the May 23, 2008 MRI results of your right shoulder and cervical spine imaging.  The right shoulder MRI showed no evidence of a rotator cuff tear as was previously reported by Dr. Dyas.  The MRI of your cervical spine revealed mild spondylitic disc changes at C4-5 and degenerative changes at C5-7 with broad based extruded disc resulting in mild central stenosis.  The May 22, 2008 office note from Dr. Dyas is devoid of any physical exam findings demonstrating the severity of any motor, sensory, vascular or neurological deficits impairing your ability to function.  We are unable to consider your appeal at this time since you have not provided medical documentation that would alter our previous decision.
>
> The information you submitted fails to demonstrate a physical or psychiatric impairment from May 10, 2007 through the present.

---

[5] In October 2007, Dr. Miller had prescribed Ambien for insomnia instead of Xanax. (Doc. 112-2, p. 192)

As stated in your previous denial letter, you will need to provide us with medical documentation to support your appeal.  Medical documentation includes, but is not limited to, physician's office notes, hospital records, consultation reports, test result reports, therapy notes, treatment history including a list of prescribed drugs along with their dosages, frequency and response relevant to the time period in question and/or a letter from your physician indicating why you are unable to perform the duties of your occupation.  These medical records should cover the period of May 10, 2007 through the present.

(Doc. 112-2, p. 139)

Plaintiff then filed an action in this Court on October 15, 2010.  Summary judgment was granted in favor of Defendants as to Plaintiff's claim that she did not receive a full and fair review.  As to her claim for disability benefit, the Court applied the *de novo* standard at step one of the framework for deciding ERISA claims for benefits.  The Court "reviewed the medical evidence before LINA" and found that the "decision was de novo correct." (Doc. 162, p. 24)  The parties did not dispute that LINA was granted authority to decide disability claims.  However, the Court did not proceed to any other step in the review process and therefore, did not "ascertain whether the decision was arbitrary and capricious." (*Id*.)

The Court of Appeals of the Eleventh Circuit vacated the District Court's order on summary judgment and remanded the action to the District Court "with instructions to remand Melech's claim to LINA for its consideration of the evidence presented to the SSA." (Doc. 172, p. 4)  The Eleventh Circuit did not "judge the propriety of LINA's ultimate decision to deny Melech's claim for benefits under the Policy because [it] held that LINA had an obligation to consider the evidence presented to the SSA." (Id.)  The Eleventh Circuit explained that the "crux of our holding lies in the relationship between LINA's claim-evaluation process and the parallel

SSA process." (Id.)   The Eleventh Circuit discussed LINA's requirement that claimants apply for Social Security Disability Income when applying for benefits under the Policy and that SSDI benefits are deducted from any benefits award by LINA. The Eleventh Circuit found that "in Melech's case, LINA initially sent her to the SSA but then decided she was not eligible for benefits under the Policy.  Because it no longer needed to protect its SSDI deduction, LINA ignored the status of Melech's SSDI application and the SSA's eventual decision to award benefits." (Id., p. 4-5)

The Eleventh Circuit stated that "the SSA process produces more than just a final sum of money – it also may produce additional evidence that is relevant to the claimant's physical condition and vocational capacity." (Id., p. 5)  After addressing the Policy terms regarding LINA's monitoring and participation in the SSA process, the Eleventh Circuit stated that "LINA may be able to draw a principled distinction between its own standards for granting disability benefits under the Policy and the SSA's standards for awarding SSDI. All we require of LINA is to decide Melech's claim with the full benefit of the results generated by the SSA process that it helped to set in motion." (Doc. 172, p. 26-27)

D. Plaintiff's claim on remand

On July 29, 2014, LINA instructed its claims department "to adjudicate Ms. Melech's claim on remand under the instructions from the Court … which require you to consider all of the evidence generated by Ms. Melech's Social Security Application that resulted in her award of Social Security benefits." (Doc. 197-2, p. 178)  LINA sent the Eleventh Circuit Opinion, this Court's prior orders, and the SSA record to the claims department. (Id., p. 179-209)

21

The SSA awarded Social Security Disability Income benefits on February 16, 2008. The SSA stated that "[w]e found that you became disabled under our rules on May 27, 2007." (Doc. 197-2, p. 226)  The letter does not state the rules or rationale in support of the decision. [6]

In addition to the 2007-2008 treatment records from Dr. Dyas, previously submitted to LINA, Dr. Dyas' records from 2004-2006 were included in the SSA record.   On March 25, 2004, Dr. Dyas treated Plaintiff for right shoulder pain of one month duration. He noted that Plaintiff was "hurting in her neck, right shoulder, sternoclavicular joints quite swollen and painful as is her lower back.  She is neurologically intact." (Doc. 197-2, p. 242)  He ordered MRI tests and saw Plaintiff the next week.

On April 1, 2004, Dr. Dyas noted a follows:

This patient is having a lot of pain in her neck that is radiating down into her shoulder and into her arms.  She has got a partial tear of the rotator cuff which is some of it, but I think some of it is also coming from the degenerative change in her neck.  We are going to get Dr. Volkman to see what he thinks about her neck. We did a subdeltoid injection in her shoulder today in the clavicular joint which we saw to be markedly swollen last week. It has gone down a great deal.  I did not inject it. I don't think we are going to need it now. So, we will just get Dr. Volkman to see and she is to call us next week and see what the shoulder joint is doing.

(Doc. 197-2, p. 241)

Plaintiff returned on April 7, 2004 and was seen by Dr. Volkman.  He noted her history and then, on examination, found as follows:

On exam, Mrs. Melech has about 90% normal cervical motion.  Extremes seem to aggravate some of the symptoms in the shoulder and proximal brachium. Biceps,

---

[6]  The SSA record contains treatment notes from Plaintiff's gynecologist and urologist.  Those records do not appear to contain any opinion as to Plaintiff's physical functional limitations. (Doc. 197-2, p. 243-255; 282-296)

wrist extensors, triceps, finger flexors and interossei are 5/5. Upper extremity reflexes are symmetric. Some swelling at the sternoclavicular joint on the right side. No instability or redness or warmth.

I've reviewed the MR scan of her neck and she has some stenosis at C5-6 as well as the C4-5 levels. Radiographs show some spondylosis at the same levels. This was discussed with Mrs. Melech. She is already taking Bextra. I've added Zanaflex and a handout of the cervical stretching exercises. We'll give this about 3 weeks and if the parascapular and trapezial ridge pain are not improving, we will consider an epidural steroid injection. I will check her back in 3 weeks.

(Doc 197-2, p. 241)

Plaintiff was examined again on June 17, 2004. Dr. Dyas noted that her neck, shoulder, right arm and SC [sternoclavicular) joints were "very tender". She was injected in the SC joint that same day. (Doc. 197-2, p. 240) Plaintiff was prescribed a 30-day supply of Lortab 5 in June, July, August, September (twice), November, and December of 2004. (Doc. 197-2, p. 239)

In January 27, 2005, Plaintiff had a checkup and reported that her "right shoulder is hurting." Dr. Dyas noted "She's got a partial rotator cuff tear. We did a subdeltoid injection today." (Doc. 197-2, p. 242) Lortab 5 was prescribed. (Id., p. 239)

Plaintiff renewed her prescription for Lortab 5 in April, May, and June of 2005 (Doc. 197-2, p. 237). On June 23, 2005, Plaintiff complained that her right shoulder was hurting. Dr. Dyas noted that Plaintiff has "chronic tendinitis and a slight tear of the rotator cuff. She also has osteoarthritis in the sternoclavicular joint on that side and tendinitis in the left elbow." (Id.) He prescribed Mobic and injected the right subdeltoid. (Id.)

Plaintiff's prescription for Lortab 5mg was renewed monthly for July through December of 2005. (Id., p 237-238) And again renewed monthly from January through May 2006 (Doc. 197-2, p. 235, 238)

On May 4, 2006, Plaintiff was diagnosed with "cervical radiculitis on the right" and her "subscapular bursa" was injected.  She was prescribed Naprelan, Soma and Lortab 5.  Dr. Dyas noted that Plaintiff was "intact neurologically". (Doc. 197-2, p. 235)

On May 25, 2006, Dr. Dyas noted as follows:

> Patient is hurting more and having pain radiating down her right arm. Numbness and weakness in her hand.  She was working at a bad job at a desk at a computer, and that seems to be aggravating the situation.  Her reflexes are intact.  Strength may be off a bit. . . . We are going to get the MRI repeated.  She may need an epidural or surgery.

(Doc. 197-2, p. 235) Dr. Dyas renewed monthly prescriptions for Lortab 5 for July through December 2006, and January 2007. (Doc. 197-2, p. 236)

Plaintiff returned to Dr. Dyas in February 2007 with complaints of "continuing intermittent episodes of sciatica with radiculitis in the right arm." (Doc. 197-2, p. 233)  Dr. Dyas found "tenderness of the subscapular today.  Did not want to see about surgery.  We injected the subscapular bursa and renewed her pain medication." (Id.)   On February 15, 2007, Plaintiff saw Dr. Dyas after twisting her foot. This appears to be an isolated injury.

On May 20, 2007, Plaintiff returned to Dr. Dyas.  His records from May 2007 forward were part of LINA's administrative record and identified herein. (*See supra* page 7-11)   The SSA record also contained the physical therapy notes from Fleming Rehabilitation that were part of LINA's administrative record.  (*See supra* p. 7; Doc. 197-2, p. 262-282)

The SSA record shows Jennifer Jackson, Psy.D., examined Plaintiff on December 18, 2007. Dr. Jackson noted that Plaintiff had applied for disability benefits "due to degenerative disc disease in her neck, tendinitis in her right arm, numbness and swelling in her arms and hands,

arthritis, acid reflux, a chronic kidney stone, and anxiety." (Doc. 197-3, p. 28)  Plaintiff reported

that she often felt "anxious, restless or keyed up," and "worried" since her husband died four years

prior." (Id).  Dr. Jackson noted that Plaintiff's gynecologist had prescribed Xanax, which Plaintiff

reported relaxed her "so [she] can sleep." (Id.)  Dr. Jackson noted that Plaintiff's "mood and affect

seemed appropriate", that "she did not appear anxious", and that she "was oriented to time, place

and person." (Id., p. 29)  Dr. Jackson found Plaintiff had "no signs of confusion, loose

associations, tangential or circumstantial thinking," "no signs or reports of hallucinations or

delusions," no distorted thinking, no suicidal or homicidal ideations, and "no unusual behaviors."

(Id., p. 30)  Dr. Jackson found that Plaintiff's "judgment seemed appropriate," with "adequate

insight into herself and her condition", and no memory deficits (Id.)

    As to daily activities, Dr. Jackson noted that Plaintiff watched television, listened to the

radio, sometimes did laundry, fed her animals, straightened her house and bathed. (Id.)  Dr.

Jackson diagnosed Plaintiff with generalized anxiety disorder with the following prognosis: "It

appears that a favorable response to treatment could be expected within 6-12 months." (Id.)

    Dr. Eugene Bass with the Disability Determination Service examined Plaintiff on

December 15, 2007.  He obtained a lumbar spine x-ray. The x-ray showed "mild narrowing of

the L5-S1 disc space" with no compression fractures and no spondylosis or spondylolisthesis.

The radiologist noted "mild degenerative disc disease L5-S1." (Doc. 197-3, p. 34)

    Dr. Bass noted Plaintiff's report of her present illness as chronic neck pain, varying in

severity and arm pain aggravated by work with Hertz, and numbness and tingling in the right

arm and hand that worsened in the past year.  He also noted her report of lower back pain that flares with prolonged standing.  Dr. Bass also reviewed Dr. Dyas' records. (Doc. 197-3, p. 32)

On examination, Dr. Bass found "an unremarkable gait pattern".  (Doc. 197-3, p. 33)  As to Plaintiff's neck and upper extremities, he found "right and left lateral rotation of 55 [degrees], … 35 degrees of flexion and extension, … no tenderness or spasm" but Plaintiff reported "increase pain on range of motion testing of the neck." (Id.)  He also found that the "remainder of the upper extremity examination is unremarkable at this time." (Id.).  As to Plaintiff's back, Dr. Bass found she was able to stand erect, and there was no spasm but some tenderness in the right upper gluteal region.  He found Plaintiff had 105 degrees of flexion and 30 degrees of extension without pain. (Id.)  Her lower extremities were unremarkable.

On neurological examination, Dr. Bass found "no focal strength deficits noted in the upper or lower extremities.  She is able to heel and toe walk and is able to squat and arise again. Reflexes and sensation are intact in the upper and the lower extremities.  Straight leg raising exam is negative for radicular complaints." (Id., p. 33)   Dr. Bass noted his impression as "1. Degenerative disc disease at C5-6 and C6-6 with stenosis and radiculitis of the right upper extremity.  2. Lumbar degenerative disc disease. X-rays reported as mild degenerative disc disease at L5-S1." (Id.).

Angela Lassiter with the SSA completed Plaintiff's Psychiatric Review Technique on January 14, 2008. Lassiter reported Plaintiff's diagnosis of generalized anxiety disorder, but found only mild restrictions in activities of daily living; mild difficulties in maintaining concentration, persistence or pace; and moderate difficulties in maintaining social functioning. No episodes of decompensation were noted. (Doc. 197-3, p. 35-48)

Lassiter also completed a Mental Residual Functional Capacity Assessment on January 14, 2008. (Doc. 197-3, p. 57-59)  Lassiter found that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, her ability to maintain attention and concentration for extended periods, and her ability to "interact appropriately with the general public" but she was otherwise "not significantly limited" in mental functioning. (Id., p. 57-58) Lassiter determined that Plaintiff "has the ability to understand, remember and carry out short, simple instructions, . . . can attend for two hours with regularly scheduled breaks", and that her "interaction with the general public should be infrequent," but otherwise Plaintiff was "not significantly limited".  (Id., p. 59)

Lassiter also completed a Physical Residual Functional Capacity Assessment on January 14, 2008.  Lassiter identified Plaintiff's exertional limitations as follows: Plaintiff could occasionally carry up to 20 lbs., frequently carry up to 10 lbs., stand and/or walk with normal breaks for about 6 hours in an 8 hour workday, sit with normal breaks for about 6 hours in an 8 hour workday, and her ability to push and pull was unlimited.  Lassiter found Plaintiff was unlimited as to reaching or gross manipulation and she was able to frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, and occasionally climb ladders, ropes or scaffolds. (Doc. 197-3, p. 49-56)  As to the evidence upon which she based this assessment, Lassiter referenced Plaintiff's age and education, her subjective complaints of pain, the medical records from Dr. Dyas, and the examination by Dr. Bass including his assessment of Plaintiff's ability to flex and extend. (Id., p. 50-51)

On remand, LINA's claims manager requested an independent peer review opinion from an orthopedic surgeon through a third party, Exam Coordinators Network. (Doc. 197-2, p. 172)

LINA requested that the peer review orthopedist contact Plaintiff's health care providers and evaluate the time period of May 11, 2007 to present.  The special instructions asked the peer review orthopedist to respond whether "Ms. Melech [was] physically functionally limited during any time period from 5/11/07?" and whether "Ms. Melech" require[d] any medically necessary work activity restrictions during any time period from 5/11/07? (Id., p. 173)  The peer reviewer was asked to provide a detailed analysis and rationale to support the answer that considered all the evidence including observations, examination findings, functional assessments and diagnostic studies.  The peer reviewer was asked to "focus on functionality; address functional limitations and whether work activity restrictions are medically necessary based on risk." (Doc. 197-2, p. 173)

Orthopedic Surgeon Alfred E. Mitchell, M.D. was assigned to the claim. He reviewed Plaintiff's file "from an Orthopedic Perspective only." (Doc. 197-2, p. 164) Dr. Mitchell reviewed Plaintiff's medical records including the contents of Plaintiff's SSA File. [7] (Id., p. 164, 167-168) On August 25, 2014, Dr. Mitchell issued his peer review report.  He provided a brief summary of Plaintiff's injury, *i.e.*, her neck and right shoulder pain, and treatment from 2004 through 2008, including the treating physicians' records, diagnostic test results, medication prescriptions and injections to the neck and shoulder. (Id., p. 164-165)  Dr. Mitchell noted that Plaintiff's treatment was "conservative consisting of multiple pain medication prescriptions (Lortab 5mg) from 2004 – 2007 and occasional office injections to the neck and shoulder." (Id., p. 164)

---

[7] Dr. Mitchell listed the medical records, physical therapy records, physical residual functional capacity assessment, and diagnostic test results that he reviewed – orthopedic and non-orthopedic, submitted by Plaintiff and from the Social Security Administration file – from 1997 through 2007 (doc. 197-2, p. 167-168).

From May 10, 2007 forward, Dr. Mitchell found that Plaintiff "underwent conservative office based treatment consisting of short-term physical therapy, non-invasive intermittent cervical region injections and narcotic pain medication." (Id.)  Dr. Mitchell found that

> Objective physical findings revealed decreased range of motion and tenderness without radicular provocative testing or abnormal neurologic findings.  Diagnostic testing consisted of radiographs and MRI scans.  The most consistent diagnosis was cervical degenerative disc disease.  There is no provided documentation of invasive treatments to the cervical spine of epidural injections or surgery.  There is no record of anti-inflammatory medication courses or neuropathic medication courses.  The last orthopedic office note was May 22, 2008 by Edmund Dyas MD.

(Doc. 197-2, p. 165)

He also provided a detailed summary of Plaintiff's injury and history of treatment, which included summaries of records from Dr. Dyas, Dr. Engersen, Dr. Bass, Dr. Jackson, Dr. Bland, Fleming Rehab and Sport Medicine, MRI and x-ray results, Plaintiff's statement of her activities as of November 6, 2007, and the mental and physical residual functional capacities assessments.

In response to the two questions, Dr. Mitchell found as follows:

For the time period of 5/11/07 through the present:

1.  Based on the provided records and any conversations you have with the healthcare provider(s):

> Was the claimant physically functionally limited during any time period from 5/11/07? If so, please provide a detailed analysis/rationale supporting your answer that considers all the evidence and includes reference to observations, examination findings, functional assessments and diagnostic studies.

There are two specific time periods identified as pertinent.

Yes. The claimant was physically functionally limited from her occupation from May 10, 2007 through June 6, 2007 due to an exacerbation of neck pain from activities at work. She demonstrated no documented objective physical findings on examination indicating a severe condition and had no neurological

impairment. Radiographs showed cervical degenerative disc disease and MRI was confirmatory. She improved with physical therapy.

No. The claimant was not physically functionally limited from her occupation from June 7, 2007 to the present end of the records provided on January 14, 2009. Observations through the claimant's own statements reveal adequate capability to perform activities of daily and leisure activities. Examination findings reveal a mild restriction of cervical range of motion but within a functional range. There are no documented neurologic deficits or positive radicular provocative testing. Diagnostic radiographs and MRI scans reveal chronic stable degenerative findings without evidence of trauma. There is no electrodiagnostic testing. The functional capacity assessment revealed abilities consistent with the claimant's occupational description. There is no consistent evidence of worsening of the claimant's condition in regard to increased frequency of office visits, physical therapy, specialty referrals, chronic pain specialist intervention, epidural steroid injections or consultation for surgical management. The claimant's use of narcotic pain medicine was similar if not less than prior to the May 10, 2007 date of injury.

> Did the claimant require any medically necessary work activity restrictions during any time period from 5/11/07? If yes, please provide a detailed analysis/rationale supporting your answer that considers all the evidence and includes reference to observations, examination findings, functional assessments and diagnostic studies.

Yes. From June 7, 2007 onward the claimant required medically necessary work activity restrictions of no repetitive bending and twisting of the cervical spine as well as alternate neck positions as needed such as every 30 minutes. A maximal weight restriction of 20 pounds occasionally, 10 pounds frequently and negligible amount constantly is appropriate. This is consistent with a light occupational capacity and is in agreement with the functional capacity evaluation document. Observations through the claimant's own statements reveal adequate capability to perform activities of daily and leisure activities. Examination findings reveal a mild restriction of cervical range of motion but within a functional range. There are no documented neurologic deficits or positive radicular provocative testing. Diagnostic radiographs and MRI scans reveal chronic stable degenerative findings without evidence of trauma. There is no electrodiagnostic testing.

> 2.   Please address your questions to the claimant's healthcare provider(s) to clarify return to work capabilities; include a summary of your conversation(s) with the provider(s) in your report.
>
> > This reviewer performed a search of the primary treating orthopedic surgeon's credentials as is routine in performing peer and file reviews.
> >
> > An obituary from Radney Funeral Home in Mobile, Alabama revealed Dr. Edmund Covington Dyas IV died peacefully at home January 23, 2011. He was 71 years old. No contact attempt was made as there was no indication in the provided records of subsequent treating orthopedic physicians.

(Doc. 197-2, p. 169-170)

LINA also requested a psychiatric independent peer review report. Psychiatrist Marcus Goldman, M.D. was assigned by Exam Coordinators Network.  He completed his review on August 27, 2014. Dr. Goldman attempted to contract Plaintiff's former mental health professionals at AltaPointe Health Systems, Dr. Bland and therapist Dyson, but learned that Dr. Bland had been "gone for five years" and that Dyson "does not know this claimant and does not have her in the computer." (Doc. 197-2, p. 160)

Dr. Goldman reviewed Plaintiff's medical and mental health records, including those completed and collected as part of the SSDI process.  After a clinical summary of the documents reviewed, Dr. Goldman found that for the time period as of May 11, 2007 to the present, the medical evidence was inadequate because there were only three mental health assessments covering a period of seven years, and two of the assessments were inconsistent.  He found that the records available were "generally unremarkable but for appropriate sadness" and that some reports noted impaired memory or concentration.  He found that Plaintiff did not meet the criteria

for a DSM-5 diagnosis and that the "documentation does not support functional impairment or the inability to function in a work environment due to a mental disorder as of May 11, 2007 onwards." Dr. Goldman found that "based on the very limited date available for review I would opine that information tends to rule out a validated mental health difficulty that would preclude gainful employment." (Doc. 197-2, p. 161-163).

LINA Claim Manager Melissa Graham obtained an additional occupational analysis based upon the DOT occupation of Service Manager, the restrictions and limitations in Dr. Mitchell's report and the psychiatric peer review by Dr. Goldman. (Doc. 197-2, p. 16-18). Vocational Rehabilitation Counselor Kristina DeSantis conducted the occupational analysis on September 5, 2014. DeSantis noted that she was requested to "provide comment as to whether the level of function indicated would be consistent with the customer's own light occupation." (Id., p. 16) DeSantis found as follows:

> Per Peer Review by Dr. Mitchell, Ms. Melech required medically necessary work activity restrictions of no repetitive bending and twisting of the cervical spine as well as alternate neck positions as needed such as every 30 minutes. A maximum weight restriction of 20 lbs occasionally, 10 lbs frequently and negligible amount constantly is appropriate.

> Per Peer Review by Dr. Goldman, the documentation does not support functional impairment or the inability to function in a work environment due to a mental disorder as of 5/11/2007 onwards.

> Customers weight restriction of 20 lbs occasionally and 10 lbs frequently along with no repetitive bending and twisting of the cervical spine is consistent with the physical demands of her light occupation as a Service Manager.

(Doc. 1970-2, p. 16-17)

On September 24, 2014, LINA denied Plaintiff's claim.  After a statement of the policy definition for disability and the elimination period, LINA found that Plaintiff's occupation with Hertz as a location manager, defined in the DOT as service manager, required light demand activities.  LINA then set out the specific demands of light work and discussed the opinions of Dr. Mitchell and the evidence upon which he based his opinion, Dr. Bass's orthopedic consultation, and the findings by its Vocational Rehabilitation Department.  LINA then decided that

> Although Ms. Melech had impairments that would have limited her from performing her regular occupation from May 10, 2007 through June 6, 2007 due to an exacerbation of neck pain, the medical information on file does not support continuous disability from her regular occupation throughout the Elimination Period. We found that the medical information on file and [SSA] file did not reveal any significant evidence of a functional loss or severe psychiatric impairment which preclude your client from performing her regular occupation. Therefore, we must affirm the prior decisions.

> Lastly, we considered that your client was awarded [SSDI] benefits; however, the standard for determining Disability under the [SSA] may differ from the provisions under this Policy. Disability under the [SSA]'s internal administrative standards such as deference to the treating providers or advanced age may reduce the standard of proof required to grant Disability. As outlined above, the information on file does not support impairment from your client's regular occupation.

(Doc. 197-2, p. 83-86)

III.  Standard of review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The party seeking summary judgment bears the "initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir.1991) (quoting *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the nonmoving party fails

to make "a sufficient showing on an essential element of her case with respect to which she has

the burden of proof," the moving party is entitled to summary judgment. *Celotex,* 477 U.S. at

323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of

weighing the evidence and making credibility determinations of the truth of the matter ... the

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

favor." *Tipton v. Bergrohr GMBH‒Siegen*, 965 F.2d 994, 998‒999 (11th Cir.1992).

However, the summary judgment analysis is "applied in a modified manner in an ERISA

case." *Rogers v. Hartford Life and Accident, Ins. Co*., 2012 WL 1288349, *1 at n. 2 (M.D. Ala.

Apr.16, 2012) (citing *Blankenship v. Met. Life Ins. Co*., 644 F.3d 1350, 1354 at n. 4 (11th Cir.

2011)). "Because ERISA does not set out a standard of review for challenges to the denial of

benefits brought under 29 U.S.C. § 1132(a)(1)(B)" the Court of Appeals for the Eleventh Circuit

"has developed a multi-part test, relying on the Supreme Court's opinions in *Firestone Tire &*

*Rubber Company v. Bruch,* 489 U.S. 101, 109 (1989), and *Metropolitan Life Insurance Company*

*v. Glenn*, 554 U.S. 105, 111 (2008)." *Oliver v. Aetna Life Ins. Co*., 2015 WL 4153628, *3 (11th

Cir. 2015).   The district courts proceed as follows:

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is " de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is " de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Oliver*, 2015 WL 4153628 at *3 (citing *Blankenship v. Metro. Life Ins. Co.,* 644 F.3d 1350, 1355 (11th Cir. 2011).

IV. Conclusions of law

   A. Standard of review

   Plaintiff states that a "pure *de novo* standard with no deference to LINA's decision nor any limitation on what the Court may consider" should apply. Plaintiff argues that because LINA did not reach a decision within 45 days as required under ERISA, there has been a "deemed denial" which results in the application of a "pure *de novo*" standard of review.  (Doc. 209, p. 15-

16); 29 C.F.R. § 2560.503-1(l) [8]; 29 C.F. R. § 2560.503-1(i)(3)(i) (allowing 45 days for review of a disability claim)

Defendants reply that this is not an administrative claim or appeal of an administrative denial, *i.e.*, a claim for benefits as defined in 29 C.F.R. § 2560.503(1), that would be subject to the timing requirements in the Department of Labor regulations. Instead, Defendants argue, the current proceedings are a remand to be conducted in accordance with the requirements of the Eleventh Circuit's decision. They also point out that the 45-day time period is triggered by "receipt of a claimant's request for review by the plan", 29 C.F.R. § 2560.503-1(i), but here an order of remand started the review.

On the first motion for summary judgment, the Court determined that there was no dispute that LINA was "vested with discretionary authority to determine eligibility for benefits." (Doc. 162, p. 23) The Court stated that it would begin at step one "with a *de novo* review of LINA's decision based on the evidence before LINA as found in the administrative record." (Id.) The Court concluded as follows: "The Court has reviewed the medical evidence before LINA, and finds that the decision was *de novo* correct. Therefore, the Court need not ascertain whether

---

[8]  The regulation reads as follows:

> (l) Failure to establish and follow reasonable claims procedures. In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503-1(l).

the decision was arbitrary and capricious." (Doc. 162, p. 24)  The district court reached its

decision at Step One of the framework for evaluating ERISA claims denials.

Also at the time of the first motion for summary judgment, Defendants had moved to

strike Plaintiff's Social Security Claim file (doc. 151) and Plaintiff's Declaration/affidavit (doc.

144). (Doc. 162, p. 2, n.1)  Relying upon the decision in *Blankenship v. Metropolitan Life Ins.

Co.*, the Court granted the motion to strike. (*Id.*, 644 F. 3d 1350, 1354 (11th Cir. 2011) ("Review

of the plan administrator's denial of benefits is limited to consideration of the material available

to the administrator at the time it made its decision. Whether the administrator's decision was

either *de novo* correct or reasonable under this Circuit's *Williams* framework is a question of

law.") (citing *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th

Cir.1989)).  In keeping with *Blankenship,* the Court considered only the "evidence before LINA

as found in the administrative record" to find that the decision was not *de novo* wrong and did not

rely upon the SSA records or Plaintiff's Declaration/affidavit.

Now, Plaintiff relies on the decisions in *Kirwan v. Marriott Corp,* 10 F. 3d 784 (11th Cir.

1994)[9] and *Stefanson v. The Equitable Life Assurance Society of the United States,* 2005 WL

2277486, *9-10 (M.D. Ga. Sept. 19, 2005)[10] as support for her argument that the "pure *de novo*

standard" should apply because LINA did not issue its remand decision within 45 days.  Plaintiff

asserts that under a "pure *de novo* review" the Court can consider evidence beyond the

---

[9]  In *Kirwan*, the Plan at issue did not specifically grant the plan administrator authority to deny
disability claims.  Consequently, the Eleventh Circuit found that the district court erred in
applying the arbitrary and capricious standard of review. 10 F. 3d at 789.

[10] Stefanson filed his claim in June 2003.  By November 12, 2003, no decision had been made
and he filed his complaint in the district court.  2005 WL 2277486, at *2-3.

administrative record on remand, such as Plaintiff's Declaration/affidavit or other documents produced in discovery.

As Defendants point out, the regulation changed in 2000, after the *Kirwan* decision. While 29 C.F.R. § 2560.503-1(l) once held that if the plan administrator failed to comply with the time frames for decision-making, a claim was "deemed denied", now a claim is "deemed" to be "exhausted" and a claimant may file suit <u>before</u> the plan administrator reaches a decision. In *Torres v. Pittston Co.,* 346 F. 3d 1324 (11th Cir. 2003), the Eleventh Circuit addressed Torres' argument that the insurer's "deemed denial" by failure to act should be reviewed *de* novo without deference.  Torres argued that "[b]ecause such a denial by operation of law necessarily entails no exercise of administrative judgment or discretion, . . . no deference is due to the Plan Administrator." *Id*. at 1332. The Eleventh Circuit explained that "[s]ome courts have held that, as Torres argues, a deemed denial receives no deference upon judicial review, <u>since the plan administrator did not in fact exercise any discretion</u>" and that other courts "have held that the fact that the denial occurs by operation of ERISA regulations does not alter the otherwise-applicable standard of review". *Id*. at 1333. (underlining added) Ultimately, the Eleventh Circuit remanded Torres' action for the district court to address this argument as well as other issues.

Later, in *White v. Coca Cola,* 542 F. 3d 848 (11th Cir. 2008), the Eleventh Circuit explained as follows:

> In *Torres*, we addressed whether a "deemed denial" of benefits under a plan receives less deference on judicial review than does a denial that does not occur by operation of ERISA regulations. We explained that the Labor Department "has taken the position that" failure to comply with minimum procedural safeguards permits courts to review the decisions of an administrator without deference. *Id*. at n. 11. We declined to adopt that broad position. We instead recognized that some

courts review deemed denials de novo because they are not the result of plan administrators' discretion, and other courts "have held that the fact that the denial occurs by operation of ERISA regulations does not alter the otherwise-applicable standard of review." *Id.* at 1332–33. *As the district court observed correctly, this division of authorities was limited to administrative failures to exercise discretion. This appeal does not involve an administrative failure to exercise discretion, and Torres does not, in any event, require us to alter our standard of review.*

*White*, 542 F. 3d at 855-856 (italics added).

The trigger for application of the "pure *de novo* review" appears to be the absence of a decision by the plan administrator.  As in *White*, this action "does not involve an administrative failure to exercise discretion". *Id.* Although LINA's decision was 17 days beyond the 45-day period set forth in 29 C.F.R. § 2560.503-1(i), it issued a decision on the merits of the remand claim and Plaintiff filed her amended complaint after the decision was made.

Additionally, as Defendants argue, the delay of 17 days was not a substantial violation of the regulations, was not a serious procedural irregularity sufficient to trigger the *de novo* review, and was not due to bad faith or negligence. Defendants point out that additional time was needed to obtain the two independent medical reviews and for post-remand communications between LINA and its counsel. Accordingly, the Court finds that the "pure *de novo* standard of review" is not applicable.

In the order of remand, the Eleventh Circuit recognized that LINA has discretionary authority and explained that "[w]hen reviewing a claim administrator's denial of benefits under an ERISA plan, courts first determine de novo whether the administrator's decision was correct, based on the evidence the administrator had at the time." (Doc. 172, n.11)  Importantly, the Eleventh Circuit explained that "[t]he District Court here concluded, under *Williams's* first step,

that LINA's decision was correct based on LINA's administrative record at the time it denied

Melech's claim" which "did not contain the SSA file[.]" (Id. at p. 19).   Now, "[b]ecause LINA's

decision to deny benefits here was based on administrative record that did not contain

information from Melech's SSA file" the action has been remanded to LINA "to decide Melech's

claim with the full benefit of the results generated by the SSA process that it helped to set in

motion" (id. at p. 26-27).  LINA has now issued a decision after review of the SSA file.

Consequently, the Court will again begin its review at the first step and determine whether the

decision was *de novo* wrong.

     B. Analysis

     As an initial consideration, Plaintiff did not respond to Defendant's argument that her

mental health records, from the original administrative record and the record on remand, did not

support a finding that Plaintiff was unable to work from May 2007 through November 2007.

(Doc. 198, p. 20-22)  Plaintiff states that "psychiatric issues were never part of" her claim for

disability benefits. (Doc. 209, p. 14, n.8)  The Court finds that Plaintiff has conceded any claim

for disability benefits based on any mental functional limitations.  Therefore, a determination of

whether LINA's decision was *de novo* wrong, will be made without consideration of her mental

health records, Dr. Goldman's peer review, or the Mental Residual Functional Capacity

Assessment.

     1. Step One of the framework

     On motion for summary judgment, Defendants assert that LINA's decision on remand is

*de novo* correct. Defendants argue that the treatment records from Dr. Dyas, the examination

report by Dr. Bass, the Physical Residual Functional Capacity Assessment by Ms. Lassiter, and

the peer review opinion by Dr. Mitchell do not support a finding that Plaintiff was precluded from light work.  Therefore, Defendants contend that Plaintiff could perform her regular occupation during the 26-week elimination period.  Defendants point out that this conclusion is supported by Plaintiff's statement of her activities of daily living, the absence of document neurologic deficits or positive testing, and the absence of evidence of worsening of Plaintiff's condition. (Doc. 215, p. 9)

Plaintiff responds that Dr. Mitchell's report confirms she is unable to meet the physical demands of her "Regular Occupation."  Plaintiff points out that Plaintiff's work as Location Manager required 3 hours of bending and twisting per day and that Dr. Mitchell confirmed that from June 7, 2007 onward, she "required medically necessary work activity restrictions of no repetitive bending and twisting." (Doc. 209, p. 17)  Plaintiff argues that LINA should not have relied on the DOT description of Service Manager.  Rather, LINA should have relied on Hertz' work description, which precludes Plaintiff from her occupation.

The Policy defines "Regular Occupation" as "[t]he occupation the Employee routinely performs at the time the Disability begins." (Doc. 112-2, p. 136)  The Policy also states that "[i]n evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location." (Id.)

In determining whether Plaintiff could perform her "Regular Occupation", LINA obtained an occupational analysis based upon the DOT occupation of Service Manager and the restrictions and limitations in Dr. Mitchell's report. (Doc. 197-2, p. 16-18).   The Vocational Rehabilitation Counselor noted that she was requested to "provide comment as to whether the level of function

41

indicated would be consistent with the customer's own light occupation." (Id., p. 16)  The VRC

found as follows:

> Per Peer Review by Dr. Mitchell, Ms. Melech required medically necessary work
> activity restrictions of no repetitive bending and twisting of the cervical spine as
> well as alternate neck positions as needed such as every 30 minutes.  A maximum
> weight restriction of 20 lbs occasionally, 10 lbs frequently and negligible amount
> constantly is appropriate.
> . . .
> Customers weight restriction of 20 lbs occasionally and 10 lbs frequently along
> with no repetitive bending and twisting of the cervical spine is consistent with the
> physical demands of her light occupation as a Service Manager.

(Doc. 197-2, p. 16-17)

"[W]hen the court makes its own determination of whether the administrator was 'wrong'

to deny benefits under the first step of the Williams analysis, the court applies the terms of the

policy " *Ruple v. Hartford Life and Acc. Ins. Co.,* 340 Fed. Appx. 604, 611 (11th Cir. 2009);

citing 29 U.S.C. § 1104(a)(1)(D) and *Oliver v. Coca–Cola Co.*, 497 F.3d 1181, 1195 (11th Cir.

2007).  The terms of the Policy require that LINA consider whether Plaintiff could perform the

duties of her Regular Occupation as "it is normally performed in the general labor market in the

national economy."  (Doc. 112-2, p. 136)  LINA complied with this policy directive by way of

Dr. Mitchell's Peer Review and the Vocational Assessment based upon his Peer Review.  The

Court finds that LINA's decision to follow the terms of the Policy, as opposed to looking to how

Plaintiff submits her job was performed, does not render its decision *de novo* wrong.

Plaintiff next argues that the "unanimous" opinions of Dr. Engerson and Dr. Dyas are

*prima facie* evidence that she is disabled, and create an issue of fact that would preclude

summary judgment for Defendants.  Specifically, Plaintiff asserts that Dr. Engerson agreed with

Dr. Dyas' opinion that Plaintiff was disabled and could not return to her work.

This argument is erroneous in that Dr. Engerson did not agree that Plaintiff was disabled. On May 10, 2007, Dr. Dyas' treatment plan, in addition to medication, was to "take [Plaintiff] off work 2 weeks [and] put her on PT". (Doc. 112-2, p. 339)  Dr. Dyas recorded his opinion that 50 hours per week on the computer was "too much". (Id.)  But, he did not state that Plaintiff was disabled and could never return to work.  The next week, on May 18, 2007, when Dr. Engerson wrote "I agree with Dr. Dyas' treatment", all that he agreed with was for Plaintiff to be off work for two weeks and have physical therapy. (Doc. 112-2, p. 237)  A week later, when Dr. Dyas saw Plaintiff on Thursday, May 24, 2007, he noted as follows:

> A little better with her physical therapy and rest.  We will keep her off until next Tuesday and see her back here in two weeks.

(Doc. 112-2, p. 339)  From this an implication arises that Dr. Dyas kept Plaintiff off work until "next Tuesday", which was May 28, 2007.  Then on June 7, 2007, Dr. Dyas wrote as follows:

> To Whom it May Concern
>
> The above captioned patient is under my care. She is permanently and totally disabled.  She cannot return to her present job. . . .

(Doc. 112-2, p. 340)  Thus, Dr. Engerson never agreed that Plaintiff was permanently and totally disabled and could not return to her work.  Their opinions are not unanimous and consequently, do not create the *prima facie* evidence of disability as Plaintiff argues. Moreover, as noted by LINA, Dr. Dyas' opinion is devoid of any supporting documentation.

Plaintiff next argues that LINA failed to give the SSA decision the meaningful consideration it requires.  She argues that the SSA's review is broader and therefore more complete and at a minimum, shows that she is arguably disabled under a *de novo* standard. Plaintiff also argues that LINA cannot "disregard the vocational aspect" of the decision and that

43

the favorable SSA decision defeats summary judgment because "the inference that decision

creates must be respected." (Doc. 209, p. 23-24)

Plaintiff's argument is without merit. LINA did not "disregard the vocational aspect" of

the SSA decision.  Instead, LINA's denial letter on remand set out the results of Dr. Bass's

examination and stated that medical documentation provided in the SSA file was sent to Dr.

Mitchell for Peer Review.  In summarizing the results of his review, LINA stated that Dr.

Mitchell's restrictions were "consistent with" the Physical Residual Functional Capacity

Assessment from the SSA. (Doc. 197-2, p. 84-85).  LINA concluded

> We found that the medical information on file and Social Security
> Administration file did not reveal any significant evidence of functional loss …
> which would preclude your client from performing her regular occupation. . . .
>
> Lastly, we considered that your client was awarded Social Security Disability
> benefits; however, the standard for determining Disability under the Social
> Security Administration (SSA) may differ from the provisions under this Policy.
> Disability under the Social Security Administration's internal administrative
> standards such as deference to the treating providers or advanced age may reduce
> the standard of proof required to grant Disability.  As outline above the
> information on file does not support impairment from your client's regular
> occupation.

(Doc. 197-2, p. 85-86)

Moreover, "[t]he approval of disability benefits by the Social Security Administration is

not considered dispositive on the issue of whether a claimant satisfies the requirement for

disability under an ERISA-covered plan." *Glenn v. American United Life Ins. Co.*, 604 Fed.

Appx. 893, 896 n.3 (11th Cir. 2015) (noting that the "decision to affirm the denial of long-term

disability benefits and the Social Security Administration's grant of disability benefits are not

necessarily at odds.") (quoting *Whatley v. CNA Ins. Cos.,* 189 F.3d 1310, 1314 n. 8 (11th

Cir.1999); *Ray v. Sun Life & Health Ins. Co.*, 443 Fed. Appx. 529, 533 (11th Cir. 2011) (awards

of Social Security benefits may be considered but are not conclusive as to whether a claimant is disabled under an ERISA plan).

Plaintiff also argues that there is no evidence of significant improvement of her physical capacities after June 6, 2007 (the end of the time period that Dr. Mitchell found Plaintiff was unable to perform her Regular Occupation).  In reply, Defendants argue that the burden does not shift to Defendants, but rather remains on Plaintiff to prove her eligibility and continuing disability and that Plaintiff has failed to sustain her burden.

In *Ruple v. Hartford Life and Accident Ins. Co*., the Eleventh Circuit found that where the claimant has produced "ample evidence" of disability and there was "scant evidence in the administrative record supporting the administrator's finding that the claimant was not disabled", the burden may shift to the plan administrator to show plaintiff's disability has ended. 340 Fed. Appx. 604, 612-613 (11th Cir. 2009) (discussing *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001)).  But where "the evidence was not so one-sided or conclusive in favor of a finding that [the claimant] was disabled so as to shift the burden to" to the plan, the burden would not shift. *Id*. at 613.  Additionally, in *Ruple*, the Eleventh Circuit found that the policy required the claimant to "produce evidence of an ongoing disability." *Id*.

The same is true here.  In relevant part, the Policy states as follows:

> The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy.  . . . He or she must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before benefits will be paid.  . . . The Insurance Company will require continued proof of the Employee's Disability for benefits for continue.

(Doc. 112-2, p. 125, Policy)

The Court finds that the evidence is not so "one-sided or conclusive" in favor of Plaintiff whereas to shift the burden to Defendants.  The opinions of Dr. Engerson, Dr. Miller, and Dr.

Bass, who examined Plaintiff, her reports of daily activities found in the psychiatric reports from AltaPointe,[11] Plaintiff's responses to the "Disability Questionnaire & Activities of Daily Living",[12] and the Peer Review opinion by Dr. Mitchell, are more than "scant evidence" to support LINA's decision.

The Court has reviewed Plaintiff's medical evidence, as well as the new evidence from Plaintiff's SSA record including Dr. Bass' examination report and the Physical Residual Functional Capacity Assessment, Dr. Mitchell's Peer Review, and the VRC's analysis, all as summarized herein. The Court finds that LINA's decision that Plaintiff was not precluded from performing her Regular Occupation as defined in the Policy was not *de novo* wrong.

  2.  Step Three and Step Six of the framework

Assuming for purpose of summary judgment that the decision had been *de novo* wrong, LINA was vested with discretion in reviewing Plaintiff's claim.  The Court finds that reasonable grounds exist to support LINA's decision; specifically, the grounds upon which the Court decided that LINA's decision was not *de novo* wrong. Therefore, the Court must determine whether LINA operated under a conflict of interest.  The Court finds that because LINA both insured the Plan and made claims decisions, it operated under a structural conflict of interest.

---

[11]  In October 2008, the therapist noted Plaintiff "had a series of back problems related to her job and finally went out on disability" and that "her level of pain is high and coupled with insomnia feels exhausted all of the time." (Id., p. 88-89)  As to daily activities, Plaintiff reported that she could care for herself.  For recreational activities, she "spends time with boyfriend, adult children and her dog, loves music, the beach and going fishing". (Doc. 197-3, p. 89)

[12]  In November 2007, Plaintiff stated that "her neck hurts very badly when sitting at computer causing severe headaches and neck pain, right arm and hand goes numb. Lower back hurts when standing or bending. For period of time using phone causes pain in neck." (Doc. 112-2, p. 185)  However, her medications were identified as Nexium once daily, Lortab as needed, Soma as needed, Xanax at night, and Estrace once daily.  She indicated her visits with Dr. Dyas were on an "as needed" basis. (Doc. 112-2, p. 187) (underlines added).

(Steps Two through Five)  Proceeding to Step Six, the conflict is a factor for the Court to

consider when determining whether LINA's decision was arbitrary and capricious at Step Three.

*Oliver*, 2015 WL 4153628 at *3 (citing *Blankenship*, 644 F.3d at 1350 ("(6) If there is a conflict,

the conflict should merely be a factor for the court to take into account when determining

whether an administrator's decision was arbitrary and capricious.")

Defendants argue that the decision was not arbitrary and capricious because LINA had a

reasonable basis for its decision and that the SSA's decision does not change that conclusion.[13]

Defendants point out that SSA awards are not dispositive of disability under ERISA policies.

Defendants also point out that the SSA decision does not explain its findings or the basis and that

different standards were applied: Giving special weight to the opinion of a treating physician

when the Department of Labor has not promulgated a similar rule for ERISA claimants, and

treating age as a limiting factor.[14] (Doc. 198, p. 22-27)

Plaintiff argues that the decision was arbitrary and capricious because of the financial or

structural conflict of interest and because of procedural abuses in the first claims decision and the

---

[13]   The Eleventh Circuit found that LINA's failure to consider Plaintiff's SSA application and
record was inconsistent with the requirement that a plan administrator's decision "be based on a
complete administrative record that is the product of a fair-claim evaluation." (Doc. 172, p. 26)
The Eleventh Circuit noted that it did not "imply that the SSA's ultimate conclusion that Melech
was 'disabled' under the SSA standard creates a presumption that she is eligible for benefits
under the Policy." (Id., n. 21)

[14]   After a determination of the residual physical capacities, the SSA may apply the Medical-
Vocational Guidelines or the "Grids".  20 C.F.R. Pt. 404, Subpt. P. App. 2.  For light exertional
work, Table No. 2 applies.  Since Plaintiff was 57 at the time of her SSDI application - a person
of "Advanced Age" (age 55 to 59), a determination of disability could hinge upon whether the
SSA considered her "previous work experience" as "skilled or semiskilled" and whether those
skills were transferrable.  Also, Plaintiff is a high school graduate.  Her education level may be
considered as to whether her education would "provide for direct entry into skilled work". 20
C.F.R. Pt. 404, Subpt. P. App. 2, Table No. 2.

decision on remand.  Addressing the former first, Plaintiff relies upon the 2008 deposition testimony of two LINA employees in an unrelated action in the District of Idaho that was previously presented to the Court  (docs. 87, 131, 134, and 135) and in Plaintiff's Rule 56(d) motion. (Doc. 207) [15]  Plaintiff argues that one deponent testified that her employee performance was "measured at least informally, based on how frequently she ... met pre-set claim termination goals" set by her supervisors. (Doc. 209, p. 35)

Plaintiff also relies upon an "index" of documents that "reveal the existence of additional documents or information that LINA has knowingly withheld despite this Court's discovery directive" with counsel's explanation as to how these documents suggest an "employee-level conflict, or at least the potential" for this conflict. (Doc. 209, p. 36)  Plaintiff also relies upon numerous documents obtained in discovery or referenced in a disclosed document:  "Three documents" indicating a "percentage standard" against which LINA's employees are measured, one of which "refers to … a specific report used to measure the performance of" claims managers that may reflect "the value of the claims the employee has been able to close, *i.e.*, deny; a document that "discusses . . . the company's performance appraisal or evaluation process" and notes that year-end reviews begin with employee self-assessments;  an email that

---

[15]  Plaintiff states that consideration of summary judgment may be "premature unless and until LINA finally produces the employee evaluations and other information that Melech has sought in discovery." (Doc. 209, p. 35)  Plaintiff moved to stay consideration and the motion was granted in order for the parties to conduct discovery. (Doc. 207, Doc. 219)  The Court later set May 19, 2015 as the deadline for Plaintiff to supplement her response to the motion for summary judgment. (Doc. 244)  On May 19, 2015, Plaintiff filed a supplement to her Rule 56(d) motion to further delay consideration of summary judgment based upon continuing discovery disputes. (Doc. 247) On June 17, 2015, the Magistrate Judge entered an order stating that no more discovery was warranted and that the pending summary judgment motion could now be considered. (Doc. 256)  To date, Plaintiff has not supplemented her response to the motion for summary judgment with any additional evidence regarding employee evaluations or other information.

"identifies the existence of financial incentives for claims personnel and even identifies by name the program which establishes their goals"; "several pages" of documents that reveal the "existence of incentives for claims handlers meeting profitability goals, on of which is an email referring to a "process for measuring employee performance for purposes of rewarding employees who have contributed to the company's pursuit of its profit-driven goals in increasing shareholder value"; and an email that reveals the existence of an unattached "important memorandum" which "discusses at length LINA's linking of a manager's performance . . . [to] management incentive compensation programs." (Doc. 209, p. 35-38).

Because LINA makes eligibility decisions and pays benefits, a structural conflict of interest exists. *Blankenship*, 644 F.3d at 1355. However, Plaintiff still has the burden to prove that LINA's decision was arbitrary and capricious, and LINA does not have to prove that the decision was not tainted by self-interest. *Id*. Structural conflicts of interest remain only one factor in determining whether LINA abused its discretion. *Id*. The analysis focuses on whether a reasonable basis existed for LINA's decision. *Id*. Even where a conflict of interest exists, deference must still be given to LINA's "discretionary decision-making". *Id.*

Plaintiff has not met her burden to establish that LINA's structural conflict of interest "had sufficient inherent or case-specific importance" to support a finding that the decision was arbitrary and capricious. *Blankenship*, 644 F.3d at 1357. Alleging the existence of reports to measure performance which may reflect the value of claims an employee has closed, company performance appraisals or evaluations, financial incentives for meeting profitability goals, rewarding employees who contributed to increasing shareholder value, and linking performance to incentive programs, are not sufficient to show that the conflict influenced LINA's claims decision on remand. *See Howard v. Hartford Life & Accident Ins. Co.,* 929 F. Supp. 2d 1264,

1301 (M.D. Fla. 2013 ("The financial conflicts of interest about which Howard complains, in the form company profitability, [and] employee compensation and bonuses . . . are 'an unremarkable fact in today's marketplace.'") (quoting *Blankenship*, 644 F.3d at 1356.)  Additionally, deposition testimony in an unrelated action is not sufficiently case-specific to support Plaintiff's burden. *Howard,* 929 F. Supp. 2d at 1300.  ("Howard cites to extrinsic evidence in the form of deposition testimony, . . . [and] the testimony of a former Hartford claims adjustor from Georgia who had nothing to do with this case[.] … Not only does this constitute extrinsic evidence that was not before the Administrator at the time of the decision, but it also is not case-specific evidence that Hartford's . . . compensation structure in any way influenced Hartford's decision in this case.")  More important, whether the decision-maker was influenced by financial concerns still does not undermine the fact that the evidence simply does not support that Plaintiff was unable to perform her Regular Occupation as performed in the national economy.

Plaintiff also argues that the numerous procedural abuses[16] that occurred in the first claims decision as well as the procedural abuses that occurred during the remand decision,

---

[16] Plaintiff also argues that the procedural abuses that occurred before the remand, when considered with the procedural abuses occurring during the remand decision, are evidence that the Court should enter judgment for Plaintiff.  (Doc. 209, p. 31-34)  Plaintiff explains that because the Eleventh Circuit's remand pretermitted review of all other issues pending inclusion of the SSA file in the ERISA record, these issues remain live. Plaintiff asks this Court to reconsider its earlier decision on summary judgment as to these issues.  Also, Plaintiff states that she raises these issues to preserve them for appellate review. Defendants argue that these issues should not be re-litigated because the sole issue before the Court is the correctness and reasonableness of the decision on remand.

The issues Plaintiff identified are whether there was a conflict of interest from the beginning of the claim's process, whether LINA improperly allowed the same supervisor who decided Plaintiff's original claim to participate on appeal in violation of specific ERISA regulations, that LINA failed to adequately set out its rationale as to how the medical evidence did not support Plaintiff's claim, that LINA's termination letter did not describe with sufficient particularity the additional material or information Plaintiff should submit to succeed on her claim and explain

precluded Plaintiff from a full and fair review of her clam as required by ERISA's statutory requirements, 29 U.S.C. 1133 and 29 C.F. R. 2560.503-1(a), and are evidence that LINA's conflict of interest influenced the decision. Plaintiff argues that where there are procedural abuses, even a *de novo* correct decision or a *de novo* wrong decision (that is not arbitrary and capricious) cannot stand and judgment should be entered for Plaintiff.

As to procedural abuses, Plaintiff argues that LINA failed to provide a full and fair review on remand because it did not consider all the evidence reasonably available including the original claim file, Plaintiff's Declaration/affidavit from 2012, and "all other documents exchanged with LINA's lawyers throughout this case either in correspondence or in pleadings over the Court's ECF system" (doc. 209, p. 29).[17]  Defendants respond that the Eleventh Circuit's remand decision did not suggest that anything filed in the Court or any evidence that was not before or available to LINA at the time of the decision should be considered on remand.

The Court finds Defendants' response persuasive.  Defendants correctly assert that the remand decision required LINA to consider the evidence in the SSA file and the administrative record from the original decision.  Without submission of persuasive case law from the Eleventh Circuit – Plaintiff relies upon a Sixth Circuit decision to argue that the plan administrator must consider all pertinent information reasonably available - the Court declines to find that because a document has been exchanged by counsel whether as correspondence or pleadings over the ECF

---

why that information was necessary, and that LINA's employees failed to give meaningful consideration to Plaintiff's submissions during the original claims process. (Doc. 209, p. 31-33)

The Court declines Plaintiff's invitation to reconsider its earlier decision.

[17]  Plaintiff argues that LINA did not provide her Declaration/affidavit to Dr. Mitchell who evaluated her credibility as to her allegation of pain without "having met her or spoken with her" or speaking to her doctors. (Doc. 209, p. 29)

system, it has become "available" to LINA such that it failed to provide a full and fair review by not considering those documents.

Plaintiff also argues that LINA failed to provide Plaintiff with the opportunity to provide written comments, or documents, etc., in response to the new evidence underlying her remand claim denial – Dr. Mitchell's Peer Review opinion.  Plaintiff asserts that her claim was denied on a new basis, that she was unable to perform her Regular Occupation from May to June 2007 but did not meet the 26 week Elimination Period, instead of a denial based on lack of objective evidence to support Dr. Dyas' opinion of total disability as found in LINA's original claim denial decision. Plaintiff asserts that she should have been given an opportunity to respond before LINA issued its claims decision.

 Again, the Court finds Defendants' response persuasive.  Defendants distinguished the case upon which Plaintiff relied, *Gagliano v. Reliance Standard Life Ins. Co.,* 547 F. 3d 230 (4th Cir. 2008), explaining that this is not a case where the decision on remand was based on a wholly different rationale.  Defendants explain that in *Gagliano,* the claim on remand was denied for the first time on basis of a pre-existing condition, but here, the original claim and the remand claim were denied on basis that Plaintiff could perform her Regular Occupation and was not disabled under the terms of the Policy. Accordingly, the Court finds that there was no failure to provide Plaintiff with a full and fair review on remand.

Moreover, Plaintiff has not met her burden to establish that LINA's decision was tainted by the conflict or by procedural abuses such that it was arbitrary and capricious. *Id*. at 1355 ("Where a conflict exists and a court must reach step six, 'the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.'")   With deference to LINA's decision-making and consideration of

conflict of interest as a factor in deciding whether the decision was arbitrary and capricious, the Court finds that LINA's decision to deny benefits was reasonable based on the record before it, and not arbitrary or capricious. *See Echols v. Bellsouth Telecommunications, Inc.*, 385 Fed. Appx. 959, 961 (11th Cir. 2010) ("[G]iven the eminent reasonableness of the decision, the lack of evidence that any assumed conflict influenced the claims decision indicates that any assumed conflict should be given little weight in judging whether the decision was an abuse of discretion."); *Miller v. Prudential Ins. Co. of America,* 625 F.Supp.2d 1256, 1266 (S.D. Fla. 2008) ("malice, self dealing, a parsimonious claims granting history, or other circumstances [may suggest] a higher likelihood that the structural conflict affected the benefits decision.")

V. <u>Motion to strike</u>

Defendants move to strike Plaintiff's Exhibit 2, the Hertz Company Overview downloaded from the Hertz website (doc. 210-2), Plaintiff's Exhibit 7, her Declaration/affidavit signed in 2012 and previously submitted in this action (doc. 144, doc. 210-7) and Plaintiff's Exhibit 8, the Targeted Market Conduct Examination Report (doc. 210-8), which are cited in the Plaintiff's response. (Doc. 216)   Defendants argue that these Exhibits are outside the administrative record and therefore, were not before LINA when making the claims decisions.[18]

Plaintiff responds that the Court may conduct a pure *de novo* review and consider these exhibits because Defendant LINA did not make a decision within 45 days.  This argument is without merit. The Court has determined that the pure *de novo* standard of review is not applicable. *See supra* p. 39.   Generally, only evidence that was before plan administrator may be considered when determining whether the decision was *de novo* wrong or arbitrary and

---

[18]   In the order granting summary judgment, the Court granted the motion to strike as to Plaintiff's Declaration/affidavit. (Doc. 162, n. 1)

capricious.  *Blankenship*, 644 F. 3d 1350, 1354 (11th Cir. 2011) ("Review of the plan

administrator's denial of benefits is limited to consideration of the material available to the

administrator at the time it made its decision. Whether the administrator's decision was either *de*

*novo* correct or reasonable under this Circuit's *Williams* framework is a question of law.")

However, courts may consider evidence that was not before a plan administrator to ascertain

whether the financial or structural conflict of interest was a factor in the denial.  *Everson v.*

*Zurich American Ins. Co.*  2015 WL 1708453, *3, n.3 (M.D. Fla. Apr. 15, 2015)

(finding that "courts have permitted discovery regarding a plan administrator's conflict of interest

and the effect it has on the benefits decision" but noting that the court was not addressing the

ultimate admissibility of the documents) (citing *Howard v. Hartford Life & Accident Ins. Co.*,

929 F.Supp.2d 1264, 1289 (M.D. Fla. 2013); *Bloom v. Hartford Life & Accident Ins. Co.*,, 917 F

.Supp.2d 1269, 1277 (S.D. Fla. 2013)).  But, that evidence must show that the conflict is of

"inherent or case-specific importance." *Blankenship,* 644 F. 3d at 1353.

  As to the Overview, Plaintiff argues that it was submitted to show that because Hertz is

an "industry leader" which "can be credited with creating or defining the occupation in the first

instance", and "uniquely positioned" to "know what the occupations in their various industries

entail", LINA acted arbitrarily and capriciously by ignoring Hertz's description of Plaintiff's

occupation. (Doc. 220, p. 6)   However, the Policy definition of  "Regular Occupation" explains

that  "[i]n evaluating the Disability, the Insurance Company will consider the duties of the

occupation as it is normally performed in the general labor market in the national economy.  It is

not work tasks that are performed for a specific employer or at a specific location." (Doc. 112-2,

p. 136)  Regardless of "how big Hertz is" or its status as an "industry giant"  (doc. 220, p. 7), it is

a "specific employer" and the Overview as evidence of Hertz' size is not relevant to the issues before the Court.

Plaintiff argues that the Declaration/affidavit should not be struck because it was actually in LINA's possession during the remand claim administration. Plaintiff asserts that all documents exchanged by counsel during the litigation was available to LINA and can be considered part of the remand administrative record. Plaintiff asserts that LINA had the Declaration/affidavit before it on remand when it denied benefits, but Defendants "removed" it when they "compiled" the claim file. Plaintiff alleges that the Declaration/affidavit was removed from "the same document [doc. 144] that included" her SSA record, before LINA made its claims determination on remand. (Doc. 220, p. 8, italics in original) Plaintiff cites to Defendant's evidentiary submission (doc. 197-2 and 3) and states that the "cover page for [her] affidavit is included in the remand claim file, but her affidavit is not." (Doc. 220, p. 8) [19]

As to the removal of the Declaration/affidavit from the claim file, Defendants state that when Plaintiff filed her SSA file with the Eleventh Circuit, the tab for Doc. 144, Exhibit 2, included the cover page but not the Declaration/affidavit. (Doc. 237, p. 5, n.4; Doc. 215, p. 14-15) Defendants state that this "part of the record was transmitted as the SSA file for LINA's remand review" and that Plaintiff incorrectly asserts that LINA personnel received the Declaration/affidavit. (Id.) In other words, Defendants assert that the Declaration/affidavit was not received by LINA.

---

[19] Apparently, the document that Plaintiff refers to as the "document" that included her SSA record and her Declaration was the "Submission of Additional Evidence in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment." (Doc. 197-2, p. 211) The additional evidence identified was the SSA file (Exhibit 2) and Declaration (Exhibit 3). As Plaintiff states, the cover sheet for Exhibit 3 is in the record, but the Declaration is not. (Doc. 197-3, p. 73) This same Submission is found at Doc. 144, in this Court's docket. The Declaration/affidavit is attached to Doc. 144.

Although a question exists as to whether the Declaration/affidavit was in the remand administrative record when LINA made its decision, the Eleventh Circuit remanded the action for LINA to consider "the evidence presented to the SSA" and that all it required of "LINA is to decide Melech's claim with the full benefit of the results generated by the SSA process that it helped set in motion." (Doc. 172, p. 4, 27)  The Court is unable to find any indication that the Declaration/affidavit that Plaintiff signed in July 2012 was part of her SSA record.

Moreover, Plaintiff argues in response to the motion for summary judgment that Dr. Mitchell did not consider the Declaration/affidavit when making his Peer Review opinion.  That may be true, but as Plaintiff also points out, her Declaration/affidavit is "consistent with the questionnaire responses she completed time and again during the administration of this claim." (Doc. 209, p. 20)  Her statements regarding pain are found in reports from AltaPointe[20] and in the November 6, 2007 Disability Questionnaire[21] for the SSA.  These documents, made contemporaneously with Plaintiff's application for SSDI and her application for benefits with LINA, are arguably more relevant and reliable than the Declaration/affidavit made in 2012.  Further, Dr. Mitchell referenced the Disability Questionnaire and the October 1, 2008 report from AltaPointe in his opinion. (Doc. 197-2, p. 167-168)

As to the Targeted Market Conduct Examination Report, Plaintiff argues that it should not be struck because it is evidence of a history of biased claims practices, hence a conflict of

---

[20]  In October 2008, the therapist noted Plaintiff "had a series of back problems related to her job and finally went out on disability" and that "her level of pain is high and coupled with insomnia feels exhausted all of the time." (Id., p. 88-89)

[21]  In November 2007, Plaintiff stated that "her neck hurts very badly when sitting at computer causing severe headaches and neck pain, right arm and hand goes numb. Lower back hurts when standing or bending. For period of time using phone causes pain in neck." (Doc. 112-2, p. 185)

interest. (Doc. 220)  Defendants argue that the Market Report, which was part of a Regulatory Settlement Agreement was not included in the administrative record and should be struck. (Doc. 216)  However, as previously explained, evidence used to attempt to establish a conflict of interest may be considered by the Court.  But, in this case, the Plaintiff has dumped a 50-page Report, which was referenced in one sentence in her response. [22]  Plaintiff failed to cite to the specific sections of the Report that support her argument that LINA committed procedural abuses during the initial and remand claims determination.  The Court will not search the Report to determine which section may support Plaintiff's position.  *See Sharpe v. Global Sec. Int'l*, 766 F.Supp.2d 1272, 1282 n.9 (S.D. Ala. 2011) (on summary judgment, "the Court ... will not independently examine uncited portions of the record in search of support for a particular proposition").  Therefore, Defendants' motion to strike is granted.

## VI.  Conclusion

Upon consideration, and for the reasons set forth herein, Defendants' motion for summary judgment is granted and Defendants' motion to strike is granted.

Final judgment shall be entered by separate document as required in Rule 58 of the Federal Rules of Civil Procedure.

DONE and ORDERED this the 10th day of August 2015.

s/ Kristi K. DuBose
KRISTI K. DuBOSE
STATES DISTRICT JUDGE

---

[22]  "In fact, these same abuses are among those addressed recently by numerous state departments of insurance, showing that LINA has a history of biased claimed administration. *See* Appendix, Exhibit 8 (Market Conduct Examination Report)." (Doc. 209, p. 38)